## ROSETTE AUBERT, f. w. c., et al. *v.* JUSTIN AUBERT et al.

A testament is without effect until it is proved and the execution of it ordered. A will proved in the court of probates, but not ordered to be executed, can have no legal effect, and cannot be the basis of prescription. C. C. 1637, 3507.

The admission of a will to probate and the order to record are not judgments binding on the heirs even if they were present or duly cited.

Testaments are more easily avoided than contracts, on the ground of unsoundness of mind. They may be avoided although the insanity was not notorious and an interdiction was not applied for, even where more than thirty days elapsed between the time of making the will and the testator's death. C. C. 1781, secs. 6 and 10.

A will made by an insane person during a lucid interval is valid. C. C. 1781. But a *lucid interval* in the sense of the law, is not an apparent tranquility or seeming repose. It is not a simple diminution or remission of the disease, but is a temporary cure: an intermission so clearly marked that it perfectly resembles a return of health, and must have continued for a length of time sufficient to give certainty to the temporary restoration to reason.

APPEAL from the District Court of Lafourche, *Randall*, J. *C. Belcher* and *J. C. Beatty*, for appellants. *J. L. Cole* and *B. G. Thiboudeaux*, for appellees. The judgment of the court was pronounced by

ROST, J. *Rosette Aubert*, a free woman of color, in her own right and as tutrix of her minor children, asks that the heirs of *Pierre Aubert*, be compelled to execute his will and to pay over to her the legacies it contains in her favor

and in favor of her said children. *Marguerite Aubert*, one of the heirs, has joined in the prayer of the petition for the execution of the will, and claims from her co-heirs the legacies made to her. All the other defendants have pleaded the general issue, and have further averred: 1. That the will has never been rendered executory or ordered to be executed. 2. That *Pierre Aubert* was not of sound mind at the time he made it. 3d. That the will is void for defects of form. 4. That *Rosette Aubert* was the concubine of the testator, and her children are his adulterous bastards; that they can neither inherit by will nor sue for alimony, and that their mother is without capacity to take under the will, being reputed in law a person interposed.

The case was tried before a jury, who found a general verdict in favor of the defendants. *Rosette Aubert* and *Marguerite Aubert* have taken separate appeals from the judgment rendered on the verdict.

The plaintiffs have pleaded, in this court, the prescription of five years in bar of the causes of nullity of the will set up by the defendants. The defendants having waived their right to have the cause remanded under art. 902, C. P., this question will first be examined.

*Pierre Aubert* died in October, 1839. On the 20th November of that year, his will was probated and ordered to record. At that stage of the proceeding the heirs of age protested against its execution, on the grounds now set up by them in defence. After this protest, no order was made for its execution; the executor did not apply for letters testamentary, and the legatees set up no claim until this action was instituted on the 24th of March, 1849.

Art. 1637, C. C., provides that a testament is without effect until it is proved and the execution of it is ordered. This principle was recognized in the case of *Stewart's Curator* v. *Row*, 10 L. R. 530; in which it was held, that a will proved in the court of probates, but not ordered to be executed, can have no legal effect. We re-affirmed this decision in the case of *Marcus* v. *Barcas*, 5th Ann. 265. The will having to this day remained without effect, cannot be the basis of prescription. It follows also from the same principle, that the prayer of the petition should have been for a decree making the will executory. No exception, however, having been taken in *limine litis* to the form of the action, we will proceed to decide the case on its merits, premising that the admission of the will to probate and the order to record, are not judgments binding upon the heirs, admitting them to have been present or duly cited. *Robinet et al.* v. *Verdun's Heirs*, 14 L. R. 542. *Sophie* v. *Duplessis et al.*, 2d Ann. 724.

In consequence of the generality of the verdict and of the neglect of the parties to call upon the judge to charge the jury in relation to the questions of law which the issue presents, there is some uncertainty as to the ground upon which the jury decided. It is clear, however, that the verdict is not based upon the ground of concubinage; because that ground could not affect the rights of *Marguerite Aubert*. There is no reason to believe that the verdict is based upon informalities in the will, because no material informality has been shown; and the ground that the action could not be maintained until the execution of the will had been ordered, should have been pleaded as an exception, and was not properly before the jury. The only ground of defence remaining is, the unsoundness of mind of the testator at the time he dictated the will. And in relation to this ground, our attention has been called to several bills of exception taken by the defendants during the trial.

The will purports to be a nuncupative will under private signature, and was written by *Joseph Nicolas*, who signed it as a witness. He was first introduced

14

AUBERT
*v.*
AUBERT.

as a witness in the cause by the plaintiffs. He was then recalled by the defendants, and testified that *Aubert* had some difficulty in stating the names of the slaves he wanted to donate, and that he did not remember the names of some of them, and that *Rosette,* the present plaintiff, assisted him in ascertaining the names of such of the slaves as he did not remember. This part of his answer was objected to, on the ground that it was an attempt to introduce proof of suggestion in violation of art. 1479 of the code. The court sustained the objection, and ordered the evidence already taken down to be erased. The defendants' counsel reserved the point by a bill of exceptions.

The same witness was subsequently asked, whether, when he was writing the will, the testator could recollect the dispositions he had made verbally without their being repeated to him by other persons; he was also asked whether the testator was capable to dictate, in succession, the different dispositions of his will as they had been written, without the assistance of another person. There are bills of exception to the opinion of the judge refusing to receive this evidence, on the ground that it tended to prove suggestion.

We are of opinion that the bills of exception were well taken, and that the evidence should have been admitted. The issue was not that the testament of a person of sound mind had been made under the influence of suggestions from other persons. The only object of the evidence offered was to show the unsoundness of mind of the testator; and it appears to us the best which could have been adduced for that purpose. Evidence is admissible or not, according to the object for which it is offered. As a general rule, for instance, parol evidence is not admitted to contradict written contracts, but it is admissible when fraud is alleged by one of the parties to them. We do not, however, think it necessary to remand the case to obtain the answers of this witness to the questions put to him.

We concur in the position taken by the defendants' counsel, that testaments are more easily avoided than contracts, on the ground of unsoundness of mind. They may be avoided, although the insanity was not notorious and the interdiction was not applied for; and when they contain, in themselves, evidence of insanity in the party, the law pronounces their nullity, although more than thirty days elapsed between the time of making them and the death of the testator. Contracts are never avoided in this manner. C. C. art. 1781, ¶ 6 and 10. This difference has its source in the consideration, that laws regulating the capacity to contract are in furtherance of the natural rights of man, and that all restraints upon that capacity are abridgments of his liberty. But all his rights die with him. The disposal of his property by will rests purely on arbitrary legislation, and is in derogation of the general laws regulating the devolution of property. Society cannot exist without the capacity to contract; but the power to dispose of property by will is not necessary to its well being.

The case under consideration is not one of insanity, properly so called. The derangement of intellect of the testator is alleged to have been the result of disease, and comes within the rule so beautifully expressed in the Roman Digest, " In adversa corporis valetudine mente captus, eo tempore testamentum facere non potest," which forms in part the subject matter of art. 1782 of our code: "A temporary derangement of intellect, whether arising from disease, accident or other cause, also creates an incapacity pending its duration, provided the situation of the party and his incapacity was apparent." Digest qui test. facere possunt, l. 17.

It is necessary to keep in view this distinction, as it has an important bearing upon the law applicable to the case. The question is, were the situation of the testator and his incapacity apparent at the time he made his will?

The evidence presents *Pierre Aubert* to us as suffering under a fearful external disease, spreading gradually over all parts of his body, and discloses the effect of it upon his mind, as it increased in intensity, and he felt more and more that the hand of death was upon him. The man of warm affection and convivial tastes; quarrelled with his friends without apparent cause; became uncommonly versatile in his affections, and secluded himself by degrees from all society. As the disease ascended towards the head, he gradually lost his sight and his memory. We see him in his last visit to his sugar house; and the witness who speaks of this visit seems to be surprised that he could still see him and call him by his name. We then lose sight of him for three weeks; and at the end of that time find him in bed, completely blind and making a will, which *Joseph Nicolas* is writing from the notes he has taken of the dispositions it is to contain. At that time, says *Nicolas*, the disease had so far progressed that the spine, neck and back part of the head were entirely covered with sores, which appeared to be in a state of gangrene. He seemed to suffer a great deal; his pulse indicated fever, and when he commenced to dictate the dispositions of his will, he was in a state of great agitation. His sight was entirely gone, and he no longer remembered the names of some of his slaves who had been around him and had served him all their lives. After he had once stated the dispositions he wished to make, and they were repeated to him by *Nicolas* before writing them in the will, he no longer recognized them, and attempted to bequeath slaves which he had already donated. From what passed, this witness has stated that he did not believe *Aubert* remembered the dispositions he had made or could have repeated them two hours after they were written.

In further proof of the alleged unsoundness of mind of the testator, it has been shown, that he ordered the fire to be put out in his room, because the heat and smoke incommoded *Nicolas* when he was writing the will, while the day was pleasant and there was neither fire nor smoke; that although he had always been much attached to his eldest son, he said he bequeathed to him an old hoe and an old spade, because he was a good fellow; that he disposed, by his will, of a slave which, to his knowledge, did not belong to him; that he made *Marguerite Aubert*, then about thirteen years of age, the depositary of $5000 for the use of the plaintiff and her children, and at the same time appointed a tutor to her; that he gave her household furniture, carriage and horses, but forgot that he intended to give her $5500; and upon this being suggested to him after the will was signed, he caused a bequest to her for that sum to be written at the bottom of it.

Another fact has been shown, more conclusive than any of the others. *Nicolas* had taken a memorandum of the dispositions which the testator desired to make and was writing the will. *Mr. Folse*, one of the persons called as a witness, came into the room and saluted the testator in a loud voice; *Aubert* did not recognize or notice him. Several persons in the room then told him, *Mr. Folse* speaks to you; but he made no reply, and appeared to be in a somnolent state. The witness left the room and was called in after the will was ready for signature. He states, that when the testator signed he appeared to be suffering very much, and that he did not seem quite *aussi assoupi* as when he first went in. Physicians of experience have testified that this state of stupor was the

result of the disease of the testator, and that after the loss of sight and of memory, the stupor was an unerring sign of approaching dissolution.

These are the facts upon which a jury of the neighborhood, the members of which could not well be deceived as to the real situation of the testator, came to the conclusion that he was *mense captus inadversâ corporis valetudine.* This testimony stands unimpeached and uncontradicted; and there is no doubt that more conclusive evidence might have been had if the plaintiffs had not delayed their suit until after the attending physician of the testator had been accidentally killed.

On behalf of the defendants, some of the witnesses to the will say that *Aubert* appeared to be of sound mind when he signed; and his overseer has stated that his mind appeared to be sound before, at the time, and for several days after making his will, and that he expressed his satisfaction at having made it, as it was his wish to give *Marguerite* more than his other children. It is strange that if such was his deliberate purpose, that he should have forgotten it at the time he made the will.

This witness states that a person who was present at the making of the will, told him that the testator was not of sound mind; and on his cross-examination, he, himself, testifies that *Aubert* seemed to be sufficiently awake to understand what he was doing when he signed the will, thus throwing doubt upon his capacity. We are satisfied that the jury formed a proper estimate of the testimony of this witness.

It was urged in argument, that although the mind of the testator may have been to some extent affected by disease, it is proved that there was no delirium when the will was signed by him, and that he was in a tranquil state of mind when he presented it to the witness; or, in other words, that if the habitual state of the testator was one of unsoundness of mind, he made the will and signed it in a lucid interval, and that is sufficent for its validity.

Art. 1781 of the code provides, that a will made by a person insane during a lucid interval is valid; and as the code no where tells us what a lucid interval is, we must resort for the meaning of that expression to the system of jurisprudence in which it was first used.

A lucid interval, under the civil law, is not an apparent tranquility or a seeming repose. It is not a simple diminution or a remission of the disease, but a temporary cure : an intermission so clearly marked that it perfectly resembles the return of health; and as the nature of the interval cannot be ascertained in an instant, it must continue during a length of time sufficient to give the certainty of the temporary restoration of reason. That time must, in all cases, be considerable.

The law, 6 Digest, de curat. fur. laid down the rule and required intervalla perfectissima, ut in quibusdem videatur etiam penè furor esse remotus. See also l. 18, § 1, Digest de acq. vel amitt. pos., and l. 9, furiosum cod. qui testamenta facere possunt.

It is easy, after this, to distinguish between a sane act and a lucid interval, and to answer the plaintiffs' argument, that after the will was made, reasonable things had been done by the testator. There never was a case of insanity in which some reasonable action was not shown. But a wise act never proved the habitual wisdom of its author. The act is instantaneous, while the interval is a state of being made up of a series of acts. It is evident that there was in this case no remission of the disease of sufficient duration to constitute a lucid interval; and that whatever may have been the outward appearances, there could be,

in fact, no remission at all, as long as the disease which caused the derangement of mind continued to increase in violence. But¯if there had been an interval of apparent reason, it seems that under the civil law this was not a species of insanity in which lucid intervals are presumed.

The Roman jurisconsults distinguished two classes of insane persons; one class they called *furiosos*, the other *mente captos*. We have already shown that the insanity of the testator was of the latter class. All the Roman laws which speak of lucid intervals have exclusive reference to the first class. No law mentions them with reference to *mente capti*. For instance, the law, 39 Digest de judiciis, authorized the insane of the first class to discharge judicial functions during lucid intervals. But this was never permitted in cases of simple insanity. Before Justinian, the sons and daughters of the *mente captus* could marry without his authorization. But the children of the *furiosus* were not dispensed from obtaining it, because the law presumed lucid intervals during which it might be given. The reason of the distinction is, that with the *furiosus* the fits and intervals were easily perceived, while in cases of simple insanity they are hardly perceptible. The definition of the *mente captus* is qui nullum extrinsecus ostendit furorem, qui habet furorem latentem,—the *furor* that dwells within without giving external signs. Dumoulin, comment. on the code, title qui testamenta facere possunt.

We are satisfied that the testator was not of sound mind at the time he made his will, and that the verdict and judgment are in conformity with the law and evidence.

It is therefore ordered that the judgment be affirmed, with costs.