LAND, J.
Thomas BlcDermott died in the city of New Orleans on July 30, 1912, leaving by will his large estate to his sister, Miss Kate BlcDermott.
On August 4, 1912, Miss McDermott made a notarial will, in which she left the bulk of her estate to Bliss Alice J. Clohecy, Miss Ella Gilmore, Joseph C. Gilmore, William U. Gilmore, and Thomas Gilmore. It appears that J. C. and Thos. Gilmore were the attorneys of Miss McDermott.
It is stated in appellant’s brief that this will was made “under the effect of a midnight attack of tuberculosis hemorrhage.”
On August 6, 1912, Bliss McDermott made another will before the same notary, in which she left the sum of $25,000, to each of the following named legatees, to wit:
Bliss Alice Clohecy, Miss Ella Gilmore, William N. Gilmore, Thomas Gilmore, Joseph C. Gilmore, Philip M. Gilmore, Miss Sallie C. Doyle, wife of Thomas Benache, Samuel Doyle, Henry B. BlcCloskey, John T. Block and Beatrice Gilmore, wife of John D. O’Beilly. Also, legacies to other persons and institutions, including one of $75,000 to the Charity Hospital of New Orleans. The residuum of the estate was left to all the enumerated legatees in proportion to the amounts stated.
On August 9, 1912, Bliss BlcDermott made a third will before Percy S. Benedict, notary, in which Bliss Clohecy and the Gilmores were left $25,000 each.
Among the new legacies appears one for $50,000 to Henry B. McCloskey. To the Charity Hospital was given $75,000 as a memorial to the testatrix and family, and the balance of the estate.
On September 12, 1912, Miss McDermott made a fourth will before Edward P. Cousin, notary, and five witnesses.
The name of Bliss Clohecy and the Gil-mores do not appear in this testament. Otherwise no important changes in the disposition were made.
On July 8, 1913, Bliss BlcDermott executed a fifth will before Cousin, notary, in which she confirmed the will of September 12, 1912, with certain stated exceptions and none others. In this testament, after reducing or revoking a few minor legacies, the testatrix revoked the donation and universal legacy to the Charity Hospital, and instituted the Loyola University of New Orleans as her universal legatee.
Among the new legacies appears one of $30,000 to William P. Burke, Jr.
Miss BlcDermott died on December 16, 1913, and on the next day Thomas Gilmore, as the nominated executor, opened her succession, producing the will of August 4, 1912, for probate. The judge refused to probate said will because of the existence of the last two wills which in a few days were duly probated. ' ■
[1,3] Whereupon Bliss Clohecy and the Gilmores instituted the present suit to probate the will of August 4, 1912, and to annul the wills of August 6, and August 8, and September 12, 1912, and July 8, 1913. The proponents have appealed from an adverse judgment. As the wills of August 6 and 9, 1912, were revoked by the will of September 12, 1912, and have never been presented for probate, and the defendants claim nothing under said wills, we think that the question of their validity vel non is not a relevant issue in this litigation. “No testament can have effect unless it has been presented to the judge of the parish in which the succession is opened.” The judge shall order the execution of the testament after its being opened and proved in the cases provided by law. C. C. 1644. “A will has no effect un *83 til duly proved and ordered to be executed by a competent court.” See Hennen’s Digest, vol. 1, p. 467e-6. It will be time enough to litigate over said purported wills when, if ■ever, they shall be probated, or presented for probate, at the instance of the executors, or legatees named therein.
The very lengthy petition of the proponents contains, in substance, allegations of fact as follows:
That on August 4, 1912, Miss Kate McDermott made a valid will in notarial form, in which the proponents, “her intimate friends and associates,” were constituted universal legatees of the residuum of her estate, and Thomas Gilmore was appointed executor.
That the wills of the 6th and 9th of August, 1912, were procured by coercion, fraud, •and undue influence exercised over Miss Mc-Dermott by 'Hugh McCloskey, aided by Wm. P. Burke and other parties, “who fraudulently took possession of the house, person, and estate of the said Miss Kate McDermott,” and denied her intercourse with her former friends and associates. That Miss McDermott was a person of weak mind and body, suffering from illness at the time, did not know what she was doing, and did not dictate said wills.
That the will of September 12, 1912, was procured by similar fraudulent practices, and Miss McDermott “was entirely without' physical or mental capacity to make any valid will in nuncupative form by public act, and was incapable of dictating, and did not dictate, the alleged last will and testament claimed to have been made at said time; that said last will emanated entirely from •said Hugh McCloskey and Wm. P. Burke; that Miss Kate McDermott did not even understand the dispositions contained in the •said alleged last will and testament.”
That the will of. July 8, 1913, was procured by similar fraudulent practices, and that at the time of its execution, Miss McDermott was at the point of death, and wholly without testamentary capacity; that she did not know what was transpiring at her bedside; that she was wholly without power to understand anything; and that she did not dictate the alleged will or codicil made on that occasion.
The defendants reserving their right to object to proof of the allegations, contained in paragraphs 3 and 4 of the petition, as immaterial and irrelevant, specially denied the allegations of fraud, coercion, undue influence, want of testamentary capacity, etc., set forth in the petition.
On the trial below the proponents offered evidence tending to prove the allegations of the petition as to the wills of August 6 and 9, 1912.
Objection was made that such evidence was immaterial and irrelevant, and on the further ground that the allegations covering captation, suggestion, etc., did not disclose a cause of action.
The court sustained the objections, and restricted the evidence to the nullity of the wills of September 12, 1912, and July 8, 1913. The court said:
“I sustain the objection; but I permit you to show her physical condition and mental condition on the 12th of September, 1912, and up to and on the 8th of July, 1913.”
The evidence shows that on September 12, 1912, Miss McDermott was physically able to leave her home and go to the oflflce of Mr. Benedict, for the purpose of consulting him, and of making her last will; and that she was mentally able to understand his instructions, and to dictate to the notary the dispositions which she desired to make of her estate.
A very intelligent witness to the will, who was called by the proponents, testified that Miss McDermott during the confectiop of the testament appeared “to be all right, to be absolutely rational and sane,” that he had a *85 long conversation with her while waiting for another witness, and she struck him “as being very sane.”
There was not a tittle of evidence adduced to show that Miss McDermott acted under duress, coercion, or restraint of any kind in the making of the will of September 12, 1912.
The same may be said of the will of July 8, 1913. Both wills are perfect as to form, but proponents contend that both are null, because not dictated by the testatrix. The evidence shows that the testatrix dictated the dispositions of the will of September 12, 1912, from a typewritten memorandum prepared by Mr. Benedict according to her special instructions.
Some such aid was necessary to avoid possible errors in amounts and in names of legatees, a number of which were charitable and educational institutions. The notary and other witnesses testified that the testatrix dictated the dispositions, and the only difference in their testimony is as to what aid she received from Mr. Benedict. On this particular point we think that Mr. Benedict is the best witness. It appears from Mr. Benedict’s testimony that the memorandum was right in front of the testatrix, who had her glasses on, and was apparently reading the writing during the dictation. The aid given by Mr. Benedict to the testatrix is described by him as follows:
“The first part of the memoranda, as I recall it, was her name, and I said to her, ‘Miss Kate, the first paragraph is your name, tell the notary your name.’ She said, ‘My name is Kate McDermott.’ And then when that was through I said ‘The next paragraph is a legacy.’ We will use Mr. Block for an example. Without giving the amount, I said, ‘Please state to the notary your desires as to Mr. Block,’ and she would dictate them with the paper before her all the time.”
The notary testified that he did not remember distinctly whether the testatrix was reading from a memorandum or whether she was repeating after Mr. Benedict, but that his recollection is clear that he “wrote down from her dictation, word by word.” Only one of the five witnesses testified that Mr. Benedict read the dispositions of the testatrix.
Mr. Benedict further testified that the will of July 8, 1913, was dictated by the testatrix from memorandum which she held in her hand, and that he did not help her or suggest anything to her.
The decrees probating the two last wills establish a prima facie ease, and the burden is on the proponents to defeat the presumption of their correctness by sufficient proof. See Fox v. McDonogh’s Succession, 18 La. Ann. 444, cited in Succession of Theriot, 114 La. 615, 38 South. 471.
[4] The aid given by Mr. Benedict to the testatrix related to the proper order in which the dispositions on the memorandum should be made. We see no valid objection to a notary or attorney instructing a testator on such a matter of form. In Landry v. Tomatis, 32 La. Ann. 113, the assistance rendered by counsel consisted in selecting the words and shaping the phraseology of the dispositions, which were immediately dictated by the testatrix to the notary. The court after citing Marcade and Ooin-Delisle, said:
“If these words might have been written by her counsel before the work of dictating and writing commenced, there is no reason why they should not be suggested for each separate clause, immediately after the completing of the preceding clause.” 32 La. Ann. 120. •
Ooin-Delisle, aá quoted, says that a testator at the time of the making of the testament may take the advice of counsel “sur la forme a donner aux dispositions.” 32 La. Ann. 119. The Godden Case, 35 La. Ann. 160 affirms Landry v. Tomatis, and further holds that a memorandum prepared by his counsel may be read to the testator by one of the witnesses. ' On this branch of the case we think that both' wills were properly dictated. As the testatrix “did” dictate the disposi *87 tions of the will, the contention that she was too illiterate to do so needs no refutation.
[2] Proponent’s petition is full of allegations of what is called “undue influence” at the common law. Our Civil Code permits no such inquiry. Article 1492 (1479) reads:
“Proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation.”
In Zerega et al. v. Percival, 46 La. Ann. 590, 15 South. 476, the history and meaning of the article was considered in a lengthy and well-considered opinion. In that case one of the grounds of the alleged nullity of the will was:
“That it was not the voluntary act of the deceased, and was not made the repository of her intentions, because same was procured by means of undue influence exercised by the defendant in his own favor, and with the view of supplanting her legal heirs.”
The defendant, a minister of religious worship, was the. surviving husband and universal legatee of the deceased.
In a supplemental petition the plaintiffs charged: •
“That the said Mrs. Percival was fraudulently prevailed upon and coerced by the defendant to leave him her said estate under fear of threats and violence, and in her weak condition of health was subjected to constant surveillance to such an extent as to deprive her of and destroy her testamentary character.”
In that case the district judge, in a very able opinion, held that the plaintiff’s petitions. disclosed no cause of action. He said inter alia, that “undue influence” is used in the same sense as “captation and suggestion,” and that article 1492 of the Civil Code closed the temple of justice against all suits of nullity for cause of captation “whether unaccompanied or coupled with fraudulent practices.” The judge concluded his opinion with the declaration that:
The authors of our Civil Code intended “to forever banish from the courts a species of litigation which, except in very rare instances, originates in disappointment, rancor, or covetousness; which offers a strong temptation for perjury and subornation of perjury; which feeds on scandal and calumny; and which penetrates within the chamal house to pour obloquy upon the ashes of the departed.”
In the same case, the Supreme Court saidr
“Following the course of the judge’s argument, we find it fortified both by the history of the article under consideration and by the two decisions to which he refers.”
The court, after reviewing the two decisions, reached the further conclusion that:
“The object of the compilers of the Code was-to preclude all evidence of acts, conduct, or motives of the testator antecedent to the making of the will as exercising influence over the testamentary dispositions therein contained; but same were not intended to prevent the admission of proof of what occurred at the making' of the testament.”
The judgment below was affirmed by an. unanimous court.
This decision sustains the ruling of our learned Brother below excluding the evidence-offered by the proponents.
Judgment affirmed.