(83 South. 366)

No. 23008.

Succession of BRUGIER.

(Nov. 3, 1919.   Rehearing Denied Dec. 1, 1919.)

*(Syllabus by Editorial Staff.)*

1. WILLS ⬤⟿21—TESTAMENTARY CAPACITY.

Capacity to make a will is tested at the time of making the same.

2. WILLS ⬤⟿52(1)—PRESUMPTION OF SANITY.

A testatrix 40 years old at the time of making her will is presumed mentally sound unless the contrary is shown.

3. WILLS ⬤⟿55(5) — EVIDENCE OF TESTAMENTARY CAPACITY.

A testatrix 40 years old when she wrote her will, which appeared to be sensible and which was executed after the removal of a judgment of interdiction, *held* not shown to be lacking in testamentary capacity, although she had suffered from a deficiency of the thyroid gland arresting mental development since she was 9 years old; the test of testamentary capacity being mental soundness, and not the size of the understanding, of one over 16 years, the age provided for in Civ. Code, arts. 34, 1475.

4. WILLS ⬤⟿50—TESTAMENTARY CAPACITY DEFINED.

"Testamentary capacity" is the ability to comprehend the conditions of one's property and his relations to those who may naturally expect to become the objects of his bounty.

5. WILLS ⬤⟿302(6)—EVIDENCE OF GENUINENESS OF OLOGRAPHIC WILL.

Evidence *held* to show that a will in olographic form written partly in ink and partly in pencil was written and signed by testatrix.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

In the matter of the succession of Marie Sophie Brugier. From a judgment admitting to probate, over opposition, an alleged last will and testament of deceased, opponents appeal. Affirmed.

Benjamin Ory, Felix J. Puig, and Pierre D. Olivier, all of New Orleans, for appellants Eliska Roux and others.

Sidney F. Gautier, of New Orleans, for appellees Cecile Thomas and others.

SOMMERVILLE, J.   The last will and testament of Marie Sophie Brugier, in olographic form written partly in ink and partly in pencil, was offered for probate, when certain relatives of the deceased, claiming to be her legal heirs, opposed the admission of the will upon the ground that the deceased had been for a number of years previous to the date of the will, May, 1916, unable to attend to her own affairs and was irresponsible and of unsound mind; and on the further ground that the will was not written, dated, and signed by the deceased. In a supplemental petition, opponents alleged that—

"The said deceased was at the very time of writing said will totally unable, physically or mentally, and for many years previous thereto, continuously and uninterruptedly, mentally and physically incapacitated to understand and to know what she was doing, or writing in the confection of the said will now offered for probate; and that she was then and had been for many years previously thereto a true cretin, with total state of physical and mental imbecility, making her totally unable to understand what she was doing, and particularly totally unable to make a valid last will and testament."

There was no testimony offered to prove that the deceased was a cretin. Cretinism is a malady which appears to be pretty well known in the Alps; but it is not known in this country. There was evidence offered, and it was shown, that the deceased was afflicted with myxœdema, a disease which produces a cretinoid appearance of the face, slow speech, and dullness of intellect, due to failure of the function of the thyroid gland. (Standard Dictionary.)   The thyroid gland appears also to be involved in cretinism, but they are not one and the same disease. Myxœdema is a disease of comparatively recent origin, and great strides have been made by the medical profession in recent years in relieving the patient afflicted with it. And the testimony shows that under the care of Dr. E. J. Mioton, with the use of certain thyroid

tablets, made from the thyroid glands of sheep, Miss Brugier was very much improved, and was pronounced well by the physician; that is, in so far as a cure could be effected, by the continuous use of the thyroid tablets.

[1] Capacity to make a will is tested at the time of making same. Succ. McDermott, 136 La. 80, 66 South. 546; Succ. Schlumbretch, et ux., 138 La. 173, 70 South. 76.

[2] Miss Brugier was 40 years of age at the time of making her will, and she will be presumed to be mentally sound unless the contrary be shown.

[3] The will admitted to probate is a sensible one, written, dated, and signed by her; and that is the best answer to an allegation of absence of capacity. It was written on a form given to her some years previous to her death by her then counsel, Judge Charles F. Claiborne, now of the Court of Appeal. In the will, the deceased disposed of all of her property, giving it to her friends, servants, and charities in which she was interested.

Opponents offered in evidence certain interdiction proceedings, instituted by Mrs. Brugier, the mother of the deceased, in the year 1900, wherein there was judgment declaring Miss Brugier to be an interdict. The judgment was based on the expert reports of Drs. E. J. Mioton and Sidney J. Théard, two reputable physicians of the city of New Orleans. They both declared, at that time, that Miss Brugier was not capable of attending to her own affairs. Within a year after the judgment was rendered, Miss Brugier, individually, went before the same learned judge and asked that the judgment of interdiction be removed on the ground that she had recovered her health, physically and mentally. The two experts who had been appointed previously were appointed again; and they both made reports to the effect that Miss Brugier had been entirely restored to health, and that she was at that time capable

of attending to her own affairs, And the same judge, who had adjudged her an interdict in the year previous, removed the judgment of interdiction; and Miss Brugier was free from the effects of that judgment since the year 1901.

Dr. Mioton was called as a witness in this case by the opponents. He testified that he had begun treating Miss Brugier at the time of her interdiction with thyroid tablets, of a French make, and that she had used them very regularly. He further said that she had responded magnificently to the treatment, and that the continued use of the thyroid tablets for several years, while he was attending to her, caused her to improve steadily. He further stated that it was necessary that the use of the tablets should be continued until the end, as the discontinuance of such use would cause a relapse. The evidence is clear that Miss Brugier continued to use the tablets to within a few days of her death.

It appears that there is no such thing as a positive cure of the disease known at this time, as the thyroid gland cannot be replaced. The tablets merely acted as a substitute for the gland in controlling the nutrition of the body.

Dr. Mioton testified in part as follows:

"I was first called to this lady, probably, 25, 20 or 25, years ago. She was then under the treatment of Dr. Edmund Hincks, of Biloxi, I think. * * * At the time of the interdiction proceedings, she was absolutely in a helpless condition, not only physically, but mentally as well. She was practically an imbecile. * * * (I treated her) until four or five years before her death. I began the treatment as soon as I saw the patient, and the treatment was the extract of the thyroid gland. * * * It is a general remedy. * * * (She responded to the treatment) magnificently, splendidly; four or five months after she began (to use the remedy) she began to show signs of marked improvement, which gradually kept up until she was practically well. * * * The effect of the treatment is to supply the deficiency of the gland or any

atrophy of the thyroid gland with consequent lack of secretion of the gland."

In answer to the question, "What would the lack of that nutrition to the whole system have upon persons from the age of 9 to the age of 25?" he answered:

"Well, just as I have stated a while ago, an œdema of the whole body.

"Q. Does that deficiency arrest mental development? A. Yes, sir; mental and physical development, both.

"Q. A person suffering from that disease, do you know of any permanent cure? A. Yes, sir; I have a case on hand now, sir, where the lady is perfectly well. There is only one other way to cure that, and that is for the lady to keep up the treatment. The patient must keep up with taking of the extract of thyroid glands the balance of her days.

"Q. When she walked, did she walk like a normal person (after she had taken the tablets)? A. Well, at the time when she was sick, she couldn't; but when she was well she did, like any other person. I think I saw her about 8 or 10 days prior to her death. I am not absolutely certain about that; I would have to have my book to answer that positively. * * * She had been in the care of Dr. Laurans in my absence, and when I came back Dr. Laurans handed me back my patient. * * * She died, practically, of the same thing (myxœdema * * *). No, sir; she was not cured, because to cure a patient like that you would have to put in a new gland. There is only one way, and that would be to put in a new organ—a new gland—there.

"Q. And the mental condition of a patient suffering from myxœdema, such as she was, developed the intelligence of an adult? A. If I can explain you that—I will explain you one thing. Myxœdema is not a cause. In myxœdema, the patient, I will state, is not insane; it is only an arrest of development, and the arrest of her intellect. It is lack of nutrition of the body as well as of the brain, which stuns for a time her intellect and her being able to take care of herself. There is no disease of the brain; there is no insanity proper. It is an arrest of the function of the body and the brain. * * * I would not say the little lady had ever been a genius at any time; but she had a good fair intellect, and answered questions very satisfactorily."

In answer to the question: "Was it the intellect of an adult, was it the intellect of a

146 LA.—2

normal mind?" he answered "Yes, sir; it was."

The testimony of Dr. Mioton is fortified by that of Dr. Laurans, both of whom were her attending physicians, as to her mental condition at, and for a long time prior to, her death. Judge Claiborne also testified to the fact that Miss Brugier attended to her business very carefully, and that he made settlements with her regularly every month during the time that he was her agent, while charged with collecting her rentals. It was he who was employed by the deceased to represent her in the proceedings to remove the judgment of interdiction. Judge Claiborne testified that the enunciation of Miss Brugier was perfectly clear; that she knew what she wanted, and what she didn't want. He said that my impression is that she did have temper, because she was very resolute and very firm. That she would go to the French Opera House to matinees. In answer to the question:

"From 1908 to 1914, during your dealings with her, what was her physical condition, her mental condition; could she take care of her business?"

—the witness answered:

"Yes, sir; I think she was fully able to do that. There is no doubt of that in my mind. She knew the pieces of property she had, and knew where they were situated; as she was very particular to get an account of the rents collected, and what they brought; and several times, when it was necessary to sell some of her property to meet her wants or to repair the property and pay taxes, she would dictate herself what property she wanted sold and would argue the matter very much."

There is testimony to the same effect, as to the capacity of Miss Brugier, by her neighbors and friends. All of which goes to show that she possessed testamentary capacity at the time of the making of her will.

The certificate of death showed that Miss Brugier died of myxœdema and pernicious

anæmia. The latter complaint might have been expected to come to a woman of 40 years of age. Dr. Laurans testified that she had bowel complaint.

[4] Opponents argue that because when a child of 9 years of age, when myxœdema appeared and the physical and mental development of Miss Brugier were arrested, that she never recovered from that condition; and that she had the intellect of a child of 9 years of age always; and therefore that she was incapable of making a will. They cite article 1476, C. C., to the effect that minors under 16 years of age cannot dispose of any property by last will and testament, and argue that Miss Brugier was incapable of disposing of her property, as she did not have the intellect of a child of 16. But the Code sets forth no such rule. Article 1475 provides:

"To make a donation either inter vivos or mortis causa, one must be of sound mind."

It is not because of unsoundness of mind, or insanity, in the child under 16 years which incapacitates it from making a will. Article 34 of the Code provides:

"Age forms a distinction between those who have, and those who have not sufficient reason and experience to govern themselves and to be masters of their own conduct. But as nature does not always impart the same maturity and strength of judgment at the same age, the law determines the period at which persons are sufficiently advanced in life to be capable of contracting marriage, and forming other engagements."

The law having determined that persons over 16 years of age, of sound mind, may make valid testaments, the courts cannot be called upon to defeat the law by establishing a testamentary incapacity not provided in the law.

The question may arise as to whether the brain or other physical organ, or whatever it may be, is so diseased or impaired as to make it an untrustworthy vehicle for the conveyance of the true wish or will of the testator unbiased by any delusion which may be the result of the disease. Miss Brugier was not suffering from any disease of the brain at any time; she was not an imbecile. Even if she had been subject to a disease of the brain, it would not be a better reason for depriving her of testamentary power than would be her having a disease of the liver. On the contrary, liability to infirmity which is the inheritance of man, and the consequent need of care, are amongst the most powerful reasons of testamentary freedom.

"Testamentary capacity has been defined to be the ability to comprehend the conditions of one's property, and his relations to those who may naturally expect to become the objects of his bounty." Godden v. Burke, 35 La. Ann. 160.

"The rule has been laid down that, on questions of testamentary capacity, the court will not undertake to measure the size, degree, or extent of a man's understanding, and that persons are in law either of sound mind or of unsound mind, there being no middle ground between capacity and incapacity. Without this rule, mere imbecility of mind of the testator, however great, does not avoid his will if he be not an idiot or a lunatic. A person is capable of disposing of his property by will, be he wise or unwise, if he is not totally deprived of reason." Wharton and Stillé's Jurisprudence (5th Ed.) vol. 1, p. 64, § 59.

The evidence is clear, by most reputable witnesses, that Miss Brugier was of sound mind and memory; that she was in possession of all of her faculties at the time of the making of her will, and for many years prior thereto; and that she was not incapacitated therefrom in any manner.

As to the charge of forgery of the will, there is no evidence whatever.

[5] Judge Claiborne testified positively that he had given the form of the will to Miss Brugier, leaving out the bequeathing parts thereof and that that portion of the will written in ink was the handwriting of Miss Brugier, as he had often seen her write and sign her name in ink. He was not so

positive as to that portion of the will written in pencil, because he had never seen the deceased write with a pencil. In addition to the testimony of Judge Claiborne, there was the testimony of several witnesses who had often seen Miss Brugier write and sign her name, others who had been in communication with her, and knew her handwriting and signature; and they testified that the instrument was entirely written, dated, and signed by her. There was also the testimony of one witness to the effect that he was present at the time of the writing of the testament, and that he saw Miss Brugier write, date, and sign the same. The proponents have sustained the burden of proving the will to have been written, dated, and signed by Miss Brugier.

The order of the trial judge admitting the will of Miss Brugier to probate was based upon full and sufficient testimony which is found in the record, and it is correct.

The judgment appealed from is affirmed, with costs.