## Succession of KNIGHT. *

### No. 1236.

Court of Appeal of Louisiana. First Circuit.

Dec. 4, 1933.

Ellender & Ellender, of Houma, for appellant.

Wurzlow & Watkins and J. K. Wright, all of Houma, for appellee.

MOUTON, Judge.

James Alexander Knight made his will in the olographic form on March 26, 1923, of all his property in favor of James M. Pool. He executed a will in May, 1931, in the same form, giving all the property he might own at his death to Mrs. Clovis Breaux.

The proof of the will demanded by James M. Pool, legatee under the first will, was opposed by Mrs. Clovis Breaux, legatee under the second will. The will to Mr. Pool was admitted to probate by the district judge, who declared the will in favor of Mrs. Breaux invalid, and dismissed her opposition, from which Mrs. Breaux appeals.

In his answer to the opposition filed by Mrs. Breaux, Mr. Pool attacked the will made to Mrs. Breaux, on the following grounds: "That the same was not entirely written, dated and signed by the testator, Knight; that James Alexander Knight was not in Houma on May 15th, 1931, where the so called will purports to have been written; that it fails to revoke all other wills; that since January, 1929, the said Knight has been sick physically and mentally; that during the month of January, 1929, he almost died from a case of pneumonia, which left him in very poor health, his mental condition was affected; that on July 4th, 1930, he was operated on for a prostate condition, since which date it was necessary for him to have medical attention; that since that date a tube has been kept in his side; that it was necessary for him to return to the hospital at least nine times for treatment; that during his suffering his mind has reached a stage of dotage; that he was childish and acted very simple and often raved as a young and uncontrolled child; that due to his mental condition and to his physical suffering, any act that he performed after July 4th, 1930, could not be considered as done of his own free will and accord; that the will dated May 15th, 1931, if wholly written and signed by him was so done under duress and threat, not that he would be harmed physically but knowing the feebleness of his mind and the childish condition that he was in, the threats and duress were made with the intention of punishment."

In his written opinion, the district judge, after referring to the evidence, concludes by saying, in referring to the second will in favor of Mrs. Breaux, quoting: "The Court remains convinced that the document was executed and signed by Mr. Knight."

Several witnesses testified that the handwriting in the two wills was similar, and so was the signature of James Alexander Knight. No witness could point out any dissimilarity between either the handwriting in the body of the two wills or to the signature of the testator. It is admitted that the first will in favor of Mr. Pool was dated, entirely written, and signed by Mr. Knight, and, as the second is similar as to handwriting and signature, there is nothing to indicate that it is spurious or a forgery.

There is a letter in the record from Mr. Allen J. Ellender, attorney for Mrs. Breaux, addressed to Mr. Knight, in which he states that in accordance with his wishes he had prepared a will devising his property to Mrs. Breaux, containing the instruction to Mr. Knight that his will should be entirely dated, written, and signed by him in his own handwriting.

Mr. Ellender testifies that he wrote a document in the exact language, as is the will now in question, dated May 15, 1931. He says that Mr. Breaux, meaning Joseph Breaux, a witness in the case, and the son of Mrs. Breaux, brought to his office the will in question dated Houma, La., May 15, 1931, signed, James Alexander Knight. He stated to Mr. Joseph Breaux that the will was in legal form, and for him to take it back to his mother.

Mr. Joseph Breaux testifies that he was in the room of Mr. Knight when he wrote this will; that he took this will to Mr. Ellender, to whom it was sent by his mother, and that Mr. Ellender sent it back to his mother, who "put it away."

It is true that Mr. Joseph Breaux was able only to read a part of the will, and was cross-examined in reference to his ability to recognize the document as being written and signed by Mr. Knight. There can be no doubt, however, that he saw him write and sign this second will, which, at the request of his mother, he handed to Mr. Ellender, who said it was in the language of the will he had prepared for Mr. Knight.

We are convinced, as was the district judge, that the second will made in favor of Mrs. Breaux was dated, written, and signed by Mr. Knight, the testator.

The proponent of that will, Mrs.

Breaux, has therefore carried the burden of proof by proving that it was executed and signed by the deceased. Succession of Brugier, 146 La. 29, 83 So. 366.

■ Sanity or soundness of mind being the natural condition of man, insanity is never to be presumed. Mrs. S. S. B. Kingbury v. Whitaker, Executor, 32 La. Ann. 1056, 36 Am. Rep. 278.

Presumption is always in favor of the will; insanity never being presumed. Wilcox v. City of Hammond, 163 La. 489, 112 So. 375.

Testamentary capacity is presumed until such presumption is destroyed by cogent, satisfactory, and convincing reasons. Succession of Mithoff, 168 La. 624, 122 So. 886.

In the last-cited case, the court said: "The degree of proof required to overcome that presumption may be likened to the presumption required in criminal cases to overcome the presumption of innocence"; and emphasized this statement by adding, this, we think, is "settled rule of law of which there can be no doubt."

■ In the answer of Mr. J. M. Pool to the opposition filed by Mrs. Breaux, the will made in her favor is attacked by reference to the physical and mental condition of the testator prior to and at the time of the execution of the second will. The incapacity to make a will must be shown at the time of its execution. Kingbury v. Whitaker, 32 La. Ann. 1055, 36 Am. Rep. 278; Succession of Mithoff, 168 La. 624, 122 So. 886. This is a well-settled rule which does not require further citations.

In the answer of Mr. Pool, reference is made to the fact that in 1929 Mr. Knight had been quite ill with pneumonia, that in July, 1930, he had been operated on for a prostate condition, and as a result a tube had been kept in his side, and since his operation he had to receive medical attention. From these troubles, we understand, the inference is drawn that, as a result thereof, he suffered physical and mental weaknesses to the extent that he "reached a stage of dotage," became "childish," and "that he raved as a young and uncontrolled child."

It is also alleged in the answer that the will dated May 15, 1931, if wholly written and signed by Mr. Knight, was done under duress and threat.

As there is no evidence that Mr. Knight, at the time alleged or before, raved as an "uncontrolled child," and no proof whatsoever that he wrote that will or signed it under duress or threats, this feature of the answer of Mr. Pool will be eliminated from consideration.

■ The real attack on the will made by Mr. Pool, as indicated by his answer, is grounded on the proposition that Mr. Knight was weakened by disease, was in his dotage, and for that reason was incapacitated from making a valid will.

The court, in deciding the case in favor of Mr. Pool, accepted that idea; as the judge said, he was not satisfied that Mr. Knight on May 15, 1931, the date of the execution of the will, "was possessed of a sound and disposing mind."

The court practically decided the case on the testimony of Dr. Crawford, who had performed an operation on Mr. Knight at the hospital at Patterson, La.

Dr. Crawford testified that he refused to remove the prostate gland; and said his "mental condition was that frequently referred to as dotage or childishness." Further, in his testimony he says, quoting: "In my opinion in dotage there is a softening of the brain and if this is present it is a permanent affair and for that reason I would say that safe and sane business affairs transacted under these conditions should be looked upon suspiciously."

Dr. Kleinpeter, another expert offered by Mr. Pool, testified to about the same effect.

Some of the witnesses for Mr. Pool testified that in his talk Mr. Knight sometimes jumped from one subject to another; and one of the witnesses, testifying on this subject, when asked if he talked to him intelligently, answered that about some things he did and about others his conversation was not so perfect.

In the case of Wilcox v. City of Hammond, 163 La. 489, 112 So. 375, it was shown that Miss Miller would talk on a subject for a while, then change it, would talk very well for a short while, etc.

In that case, the physician stated that her condition was more a childish condition than an insane condition, due to bodily decay and arterial cirrhosis.

In this case, Dr. Kleinpeter says Mr. Knight was suffering from arterial cirrhosis, and both physicians testify to his physical weakness and bodily decay.

In the case above cited, the court said that the contestants had failed to show any acts of folly or that Miss Miller suffered from any delusions, but were only able to show that she was not physically strong and held disconnected conversations, to which we have hereinabove referred.

In this case, the evidence is about of the same character and fails to sustain the contention, as it was held in the Wilcox Case, that the testator herein was incapable of executing a will.

In Succession of Mithoff, 168 La. 624, 122 So. 886, the court held that the will is legal if the testator is possessed of sufficient mental disposing capacity when the instrument

is executed, though he suffered complete senile dementia before and after its execution.

In that case the court said there was no doubt that Mrs. Mithoff was in her dotage when she made her will, being then 78 years old, and was suffering from senile dementia, a mental condition characteristic of extreme old age, and which the court found was progressive, but slow of progress in its early stages.

Here Dr. Crawford did not say it was progressive, but said it was permanent, which is about the same thing.

In the last quoted case, a lady who had been employed to attend Mrs. Mithoff testified that she was not able to carry on a conversation and had the mentality of a child; other witnesses testified that at times she did not recognize her visitors, etc.

With evidence of that character before it, the Supreme Court held that it was not convinced that Mrs. Mithoff was suffering from such mental disease at the time she made her will as to render her incapable to direct a disposition of her property as she desired.

It may be said here, as was said in Succession of Brugier, 146 La. 29, 83 So. 366, that, as the will is a sensible one, written, dated, and signed by the testator, it is the best answer to an allegation of absence of capacity.

In that case the court said also that " 'testamentary capacity' is the ability to comprehend the conditions of one's property and his relations to those who may naturally expect to become the objects of his bounty."

Here it is shown that during several years Mrs. Breaux had taken care of Mr. Knight and of his household.

In the will in question, Mr. Knight mentions that fact, and says in the will: "In appreciation of what she has done for me I will and bequeath to her all my property," etc. This expression of appreciation in the will itself clearly shows that he understood or comprehended that Mrs. Breaux could "naturally expect to become the object of his bounty."

In Succession of Mithoff, above cited, the court said it was not convinced that at the time the testatrix executed her will she was then incapacitated from disposing of her property as she desired.

We will therefore direct our attention to the question as to whether Mr. Knight was, at the time he made the will, laboring under any incapacity which prevented him from disposing of his property according to his wishes.

The district judge refers to the testimony of Mr. McIntire where this witness refers to a conversation he had with Mr. Knight during the potato season of 1931. The court says it seems to be generally agreed that the potato gathering season of 1931 was during the month of May; hence we may remark that it was going on about the time the will in question was executed, as it is dated May 15, 1931.

The court said also that it had entire confidence in the integrity of Mr. McIntire, but did not think that the talk or appearance of Mr. Knight on that occasion was satisfactory evidence showing that he was in possession of a sound and disposing mind.

Mr. McIntire says he was a friend of Mr. Knight and visited him frequently at his home. These visits, he testifies, were frequent during 1931, from the beginning of 1931 to the time of his death, which the record shows occurred in 1932. He says Mr. Knight read the papers and kept up with "everything that was going on." In his conversations, Mr. McIntire says, he would get to talking about Baily Vinson and then would branch out on Huey Long; get so excited that he would shed tears.

Baily or Billy Vinson, the writer learned by tradition, was a very daring and picturesque Confederate soldier. No doubt Mr. Knight, who was about 10 years of age during the Civil War, knew or had heard of the feats of bravery of Billy Vinson. His reference to him in these talks shows that his memory was good, and his reference to Huey Long indicated that he was keeping up with current events, thus combining appreciation of present occurrences with the recollection of past events, a sign denoting wisdom rather than folly. As far as getting excited at the mention of Huey Long's name, if that be accepted as a criterion to denote the unbalanced mind, we may remark en passant that this affliction is spreading out in different parts of the state with alarming rapidity. Many think otherwise, and believe that this exhibition of temper at the mention of the Senator's name is a rational expression of disapproval of present governmental conditions.

At the potato gathering, to which the district judge refers in his opinion, Mr. Knight, Mr. McIntire testifies, was in the field at the time, and this was in the month of May, 1931, about the time the will to Mrs. Breaux was made. He says Mr. Knight picked up some potatoes, showed them to the inspector, and asked him: "Did you ever see anything of the kind?" His presence in the field at the potato gathering, picking up potatoes and exhibiting them to the inspector, certainly did not indicate, and was not even suggestive of, any weakness, either physical or mental, in Mr. Knight.

Mr. McIntire says he had good and bad days, and this, we may remark, occurs to most all normal people who have reached the peri-

od in life called old age. On such occasions, Mr. McIntire testifies, Mr. Knight would say: "Bud I made a mistake when I did not let them go on and operate"; that tears would come in his eyes, and he would say: "Bud, I am sorry I didn't let them go on and finish the operation, if I had I would have been a well man to-day."

These expressions from Mr. Knight show that he remembered what had occurred, and that he thought he had made a mistake in not undergoing an operation, all of which indicates that he was rational and normal. The shedding of tears showed possibly that he was physically weak and was a mere manifestation of his regret that he had made the mistake to which he referred.

There is nothing to show in the conduct of Mr. Knight and in his conversation at the potato gathering in May, 1931, or in his conversation on other occasions, that he was not possessed of sufficient disposing mental capacity to make the will of May 15, 1931, to Mrs. Breaux. As there is no proof to establish that fact, even if it had been shown that he suffered complete "senile dementia before and after the execution thereof," still the presumption of testamentary capacity would not be overcome, and the will should nevertheless be maintained, as was held in Succession of Mithoff, 168 La. 624, 122 So. 886.

The fact is, however, that the proof fails to show that either before or after the execution of that will Mr. Knight suffered "with complete senile dementia," and fails entirely to show that he was suffering in that way at the time of its execution in May, 1931, as before stated.

It is true that the form for the will was prepared by Mr. Ellender with instructions to Mr. Knight to date, write, and sign his will in his own handwriting.

In the Succession of Brugier, 146 La. 29, 83 So. 366, it appeared that Judge Claiborne had given the form of the will to Miss Brugier, to which the court found no objection.

In the Succession of McDermott, 136 La. 80, 66 So. 546, 548, the court quotes from Coin-Delisle, where he says that a testator at the time of making of the testament may take the advice of counsel "sur la forme a donner aux dispositions;" that is, on the form of the will.

Here, though the testator was furnished with the form, the will, as is established by the record, was entirely dated, written, and signed by him, and was his testament.

Counsel for Mr. Pool cite the case of Rosette Aubert v. Justin Aubert, 6 La. Ann. 104, in support of their contentions.

In that case, the testator, Pierre Aubert, suffered with a fearful external disease which had spread over all parts of his body, which was covered with sores, and he appeared to be in a state of gangrene; his sight was entirely gone, and he no longer remembered the names of his slaves who were present when he was dictating his will. He then ordered fire to be put out of his room because the smoke incommoded Nicolas, who was writing the will, while there was neither fire nor smoke; and, though he loved and was much attached to his eldest son, he bequeathed to him an old hoe and an old spade and disposed of a slave he knew did not belong to him. To cap the climax, he made Margueritte Hebert, then 13 years of age, the depositary of $5,000 for the use of the plaintiff and her children, and at the same time appointed a tutor to her.

The court in that case found that the testator was not of sound mind when he made his will, and, as we see it, could not have possibly reached a different conclusion, but we fail to see how the case cited by counsel can have any controlling effect on the facts of the instant case to which we have hereinabove referred to at length.

The judgment appealed from is erroneous, and must be reversed.

It is therefore ordered, adjudged, and decreed that the judgment decreeing the validity of the will executed by James Alexander Knight March 26, 1923, in favor of James M. Pool, be and is hereby annulled and avoided; and it is further ordered that the decree annuling and avoiding the will or testament made by James Alexander Knight May 15, 1931, in favor of Mrs. Clovis Breaux, be likewise annulled and avoided; and it is now ordered, adjudged, and decreed that judgment be now rendered by this court, as should have been rendered below, that said will in favor of Mrs. Breaux, dated May 15, 1931, be and is hereby declared to be genuine and valid; that the opposition filed by Mrs. Clovis Breaux be maintained; and the will in her favor be filed for probate, registry, and execution, as prayed for by Mrs Clovis Breaux; James M. Pool to pay all the costs of these proceedings.