## No. 7638.

RAPHAEL LANDRY ET ALS. VS. EUGÉNIE TOMATIS ET ALS.

When the notary who reduced to writing, and the three witnesses who subscribed to what purports to be the nuncupative will by public act of a decedent, unite in testifying in the most formal manner that the writing was dictated to the notary by the decedent in the presence of the subscribing witnesses; and there is nothing to show that the notary or the witnesses had any interest in the dispositions made by the decedent, or that they are unworthy of belief, the effort to show that the decedent did not dictate the will (which was written in English) because she did not sufficiently understand or speak English to be able to do it, will not be successful when the evidence as to her sufficient understanding of English is conflicting.

It is no cause of nullity of a will that the testator, not accustomed to use the technical language of testamentary dispositions, has availed himself of the advice and assistance of counsel in selecting the words and shaping the phraseology which he has immediately dictated to the notary as the expression of his will.

APPEAL from the Second District Court, parish of Orleans. *Tissot,* J.

*Richard Shackelford* and *James Graham* for plaintiffs and appellees.

*Edward Bermudez* and *W. B. Lancaster* for defendants and appellants.

---

Merrick, Race & Foster, Richard Shackelford, and James Graham, for plaintiffs and appellees, contended :

1. That a nuncupative will by public act must be *dictated* by the testator to the notary, and written by the notary *as* dictated.   C. C. 1578.
2. That it cannot be said that a will was *dictated* by the testator, when it appears that the words of each clause of the will were suggested to him by another person. Laudais' French Dictionary, word *Dicter.* Also the case of Hamilton vs. Hamilton, 6 N. S. 146.
3. The formalities prescribed by law must be observed, otherwise the testament is null and void.   5 L. 105 ; 11 L. 365 ; 12 L. 114 ; 13 L. 106 ; 15 L. 28 ; 20 A. 203 ; 21 A. 116.

8

E. Bermudez and W. B. Lancaster, contra, contended:

1. That the *dictation* of a will refers to its substance, and not to its style. Where it appears that the real intent or will of the testator is expressed in the testament, its validity is not affected by the fact that the language used was suggested by another, or that the words employed by the notary were not in all respects identically those used by the testator.    Coin-Delisle D. & T. p. 368, No. 2; J. P. 1823, 21, vol. 18, p. 136; J. P. 1806, 23 July, and 24 Nov.; do. 1807, March 4, vol. 6, p. 70; do. Feb. 1, vol. 13, p. 257; Journal du Palais, 1841, vol. 1, p. 707; J. P. 1850, vol. 2, pp. 13, 14, and notes; do. December 7, 1849, Meynier vs. Meynier; J. P. 1845, vol. 1, p. 403, 404; Miguel vs. Gervais, 15 January; Maleville, vol. 2, p. 438; Grenier D. & T. vol. 1, p. 535, No. 237; Toullier, vol. 5, p. 389, No. 419; Duranton, vol. 9, p. 110, No. 76–77; Poujol D. vol. 2, p. 62, No. 17; Zachariæ, vol. 5, p. 100; Marcadé, vol. 4, p. 16; II. on act 972; Demolombe, vol. 21, p. 265, l. iii. t. 2, c. 5.; Troplong D. & T. vol. 3, p. 80, Nos. 1525, 1526; Rep. J. P. vo. Test. Nos. 494, 511, 512, 513; Hamilton's case, 6 N. S. 146; Chardon's case, 9 L. 471; Segur's case, 12 L. 28; Gonzales' case, 13 L. 106; Hebert's case, 11 L. 365; 11 A. 676; 14 A. 233; 7 A. 100.

The opinion of the court was delivered by

Marr, J.   Defendants are appellants from a judgment declaring to be null the writing which had been admitted to probate as the nuncupative will, by public act, of Mrs. Tomatis.   The single question to be solved is purely one of fact: "Was this writing dictated to the notary by Mrs. Tomatis?"

Immediately following what purports to be the dispositive part of this writing is this statement: "This will has been thus dictated to me, notary, by the testatrix, in presence and hearing of said three aforenamed witnesses, and written by me, notary, as dictated, in presence and hearing of said three aforenamed witnesses, and afterwards read in a loud and audible voice by me, notary, to the testatrix in presence and hearing of said three aforenamed witnesses, whereupon the said testatrix declared that she perfectly understood the same, and persisted therein, in presence and hearing of said three aforenamed witnesses."

The three witnesses were, Father Messardier, a minister of religion; Theo. Brummer, a given neighbor and friend of the testatrix; and W. B. Lancaster, a member of the bar, her legal adviser.   The notary, the priest, and Brummer were examined as witnesses; and they all testified, on the trial, as they had already attested, in solemn form, that the testatrix pronounced, dictated to the notary, the precise words which were

written by the notary as her will. Mr. Lancaster represented the defendants in the suit; and he was not called as a witness.

The notary and the two witnesses just mentioned are the only persons present at the making of the will who testified at tho trial; and there is no direct proof to contradict their statement and testimony that the testatrix dictated the precise words written by the notary. The will is written in good English; and the vernacular of the testatrix was such French as is spoken by the uneducated Creoles of Louisiana. She knew but little English; and she could neither read nor write. Fifteen witnesses were called to prove her ignorance of English, and her inability to use that language as tho medium of ordinary conversation; and the exigencies of the case require the deduction, from this testimony, that she did not dictate the words purporting to have been used by her, because she could not; and that the official certificate of the notary, the attestation by the three witnesses, and tho testimony given by the notary and two of the witnesses, are absolutely false.

There is nothing in the record tending to show that the notary, or any one of the witnesses to the will, had any interest in the disposition of her property by the testatrix. Not one of them has been shown to be unworthy of belief; and the solemn act, attested by thom, makes full proof of itself. The notary did not speak or understand French; but all the witnesses understood English and French. Neither the notary nor Mr. Brummer had any previous knowledge of the intention of Mrs. Tomatis; but the priest knew, beforehand, from frequent conversations with her, precisely what disposition she designed to make of her property. It must be presumed that she had consulted her legal adviser on this subject; and up to tho evening before her death, which occurred six months after the making of the will, he represented her as her attorney. These facts would, ordinarily, be regarded as affording the highest assurance that no imposition would be practiced or attempted; and that the will, as written by the notary, would be in accordance with the wishes and intention of the testatrix.

Of the fifteen witnesses for plaintiffs, one, a very old woman, eighty-one years of age, who is entirely ignorant of the English language, never heard Mrs. Tomatis speak a word of English. She is the great aunt of some of the plaintiffs. Four others are parties to the suit, two of them aiding and assisting their wives; and another is the father of two of the plaintiffs. One of the witnesses always used the French language in conversation with Mrs. Tomatis, because he took it for granted that she spoke no other language; and another never addressed a word to her in any language. One of them visited her shortly after the death of Mr. Tomatis to collect a sum of money which he had lent him; and she spoke English well enough to make him understand that she did not

have the money, at that time, to pay him; and that she would pay as soon as she had the money.

Another witness proves that Mrs. Tomatis gave her testimony in French on one occasion, because she said she could not speak English. On another occasion, the evening before her death, her deposition was taken in a case in which she was plaintiff, which was a suit to eject some of the plaintiffs from a house which they occupied. The questions were translated to her, and her answers were translated into English. The justice who took this testimony, says : "It struck me the lady didn't understand much of what was going on when spoken French or English to. It struck me she was so weak that she wasn't capable of giving good testimony." And, again, he says : "In fact she was so weak she could hardly open her mouth." In another place he says : "She did speak a work or two of English, 'Turn them out,' or something like that." No great importance is due to any thing that occurred at that time. She was probably *in articulo mortis;* and she actually died the next morning. But it is somewhat remarkable, when she had her attorney and a female member of her family as interpreters, that she should have used the English words, " Turn them out," the very best that could have been chosen to express her wishes, and the precise object of the suit.

Another of the witnesses spoke German and English only. He had occasion to see Mrs. Tomatis frequently, when he called to see her husband on business. He always addressed her in English, because he knew no French. He says she spoke a little English; "but I did not understand her very well." When asked : " Do you speak very well English yourself ?" he answered " No, sir; I speak it so I can make myself understood to a person."

It was also proven that Mr. Tomatis had told one or more of the witnesses that his wife could not speak English well enough to carry on conversation. Several witnesses testify to the same effect; and it is manifest that her knowledge of English was very limited.

The witnesses on the part of defendants, Brummer, Messardier, and Hippler, had conversed with Mrs. Tomatis frequently in English. Hippler did not speak French. He had known Mrs. Tomatis from his childhood; and Brummer and Messardier had known her for ten years. Thomas, formerly a slave, who had been brought up in the family, says she could speak almost any thing she felt like saying, " that is in regards to English, but badly spoken." Amelia Muller, who lived in the family for about two months, could not speak French. She used the English language in daily conversation with Mrs. Tomatis; and understood every thing she said. Apolina Ernst lived next door to Mrs. Tomatis for eighteen years; and she saw and talked with her in English, almost

every evening in summer, sitting before her door. Their conversations were general, sometimes about business, sometimes about family matters. It is not probable that these two persons could have been brought into such intimate association, for so many years, without finding means of talking together about any thing that might happen to interest them.

Mrs. Sherman, a neighbor, did not understand French; and she had frequent conversations with Mrs. Tomatis, in English, during a period of about twenty years. Smith, a merchant, had conversations with Mrs. Tomatis almost daily, as she was passing his store returning from market. He did not speak French; and their conversations were always in English. Mrs. Breene lived a neighbor for nineteen years, and for four or five years next door. She spoke no French ; and her conversations with Mrs. Tomatis were frequent, and always in English. Dimitry visited the family frequently. He did not speak French; and he and Mrs. Tomatis conversed always in English. He had no difficulty in understanding her or in making her understand him.

The witnesses who testified that Mrs. Tomatis could speak only the words of ordinary salutation in English are contradicted by unimpeached witnesses who actually conversed with her, some of them almost every day, for a series of years, on different subjects, and always in that language, which was the only medium of communication between them. Much of the testimony in behalf of plaintiffs is of a negative character, the opinion, the belief of the witnesses, that Mrs. Tomatis could not do, what witnesses of equal respectability say she did do, express her ideas intelligibly, and for ordinary social and business purposes, in English.

Certainly Mrs. Tomatis spoke very poor English. She habitually used the objective "me" for the nominative "I;" and she did not always observe the difference in genders. No doubt she said, on many occasions, and to different persons, that she could not speak, or could not understand, English : her husband said she could not converse in that language; and all the witnesses called for the plaintiffs may have believed that she was not capable of expressing herself in English, or of understanding what was said to her in that language; but such testimony cannot prove the falsity of a solemn notarial act, or outweigh the testimony of the witnesses who habitually used that language for ordinary social and business purposes, and who understood what Mrs. Tomatis said to them, and made her understand what they said to her.

The will of Mrs. Tomatis is very simple : " I give, devise, and bequeath unto Adolphe Tomatis the property corner of Felicity and Liberty streets, being a double house." Repeating the formal words,

in the second clause, she bestows on Elizabeth another property, being a double cottage; and repeating them again in the third clause, she gives to Eugénie her residence and all her movable property, even money. In these three bequests there are but two words, "devise" and "bequeath," which are not in general use, in the daily business of life. These two words are of no real value. They add nothing to the familiar word "give;" and to give, by will, is to devise and bequeath.

By the fourth clause Eugénie is appointed executrix, with "seizin;" and is instituted "universal legatee;" and the fifth clause revokes any former will. It cannot be assumed, as a matter of fact, that Mrs. Tomatis was ignorant of the use and effect of the words "seizin" and "universal legatee;" because, in 1850, she and her husband had made wills, each in favor of the other. Between the date of her husband's death, 25th June, 1878, and the making of her last will, 15th August, 1878, the will of her husband, which constituted her title to the property disposed of by her, was admitted to probate. A copy of her will of 9th July, 1850, is in the record, written in French; and her entire disposition was expressed by appointing her husband "légataire universel," and "exécuteur avec saisine." It cannot be presumed that her husband, making at the same time a similar will in her favor, left her in ignorance of the meaning and effect of these words in her own language; and they differ so slightly from the corresponding English words in her last will, "executrix," "seizin," and "universal legatee," that it was only necessary to inform her that they were identical in meaning and effect, to enable her to use the English words intelligently. As to the word "revoke," it is barely distinguishable, in sound, from the corresponding French verb in the expression "Je révoque," and there is no difference in the meaning.

Many persons, not illiterate, who speak the English language only, are wholly ignorant of the technical words used in this will; and yet they occur in almost every will by public act, written in English, in the State of Louisiana. Necessarily, most of the persons who use these words for dictation must have learned them for the purpose, since they are used only in testamentary dispositions. ·

It is evident that Mrs. Tomatis could not have used some of the words written by the notary, nor could she have understood their meaning and effect, without first having had them taught and explained to her. Immediately after the death of her husband she had determined to dispose of her property in favor of the defendants, as she told Father Messardier in many conversations. Her counsel spoke French and English; and it is neither impossible nor improbable that he had taught her in advance the use and meaning of these technical words. It could not have been a very difficult task for her to learn to use the formula

"I give, devise, and bequeath;" or that the English words *seizin, universal legatee,* and *revoke* meant the same, respectively, as the French words *saisine, légataire universel,* and *révoque.* She might, without any extraordinary labor, have learned, not only to utter these words so that she could dictate them, but that, when embodied in her will, they would accomplish the purposes which she intended.

By our law, R. C. C. art. 1492, "proof is not admitted of the dispositions having been made through hatred, anger, suggestion, or captation." There is no corresponding article in the Code Napoleon; and a. will may be annulled in France for suggestion or captation; and yet Marcadé, vol. 4, p. 14, commenting on art. 972 of that Code, which, like art. 1578 of our R. C. C., requires the will to be written *tel qu'il est dicté,* as it is dictated, says:

"Rien n'empêche le testateur de se faire renseigner avant la rédaction, par tel conseil qu'il voudra choisir, fut-ce le notaire qui doit recevoir l'acte, et de dicter ses volontés en lisant les notes que ce conseil lui aurait remises, ou même un modèle qu'il aurait fait rédiger par ce même conseil. Rien n'empêche non plus le notaire d'addresser quelques questions ou observations pour faire développer et rendre plus claire les volontés exprimées par le disposant; il peut même lui suggérer des *mots* exprimant mieux la pensée, mais il doit se garder de lui suggérer des *idées* nouvelles."

Still more to the purpose is what Coin-Delisle says, commenting on the same article, p. 371, No. 12: "Qu'il ne soit pas défendu au testateur de s'aider (comme le dit Ricard No. 55,) des lumières d'un conseil *au temps même* du testament, non pour dicter ses dispositions, mais pour prendre avis sur la forme à donner aux dispositions, et lui prêter le secours des termes légitimes, de sorte que la disposition partit toujours de l'esprit du testateur, *qui se servirait ensuite dans la dictée* du tour que son conseil lui aurait indiquée."

No illiterate person, few persons, not lawyers, however learned, could dictate, without some such assistance, all the words necessary to express the most common testamentary dispositions; and Mrs. Tomatis was assisted in making this will by her chosen counsel. The notary says: "She was assisted in dictating by Mr. Lancaster. The words they would speak on the subject I took down—the words 'I give'—'devise' and 'bequeath.'"

"Did not Mr. Lancaster express these English words?"

"No, sir, not to me."

"Did not he speak them out?"

"He might have spoken to her."

"Did not Mr. Lancaster tell you in English what she said to him in French?"

" No, sir."

It was proven that while the testatrix was dictating no other person spoke a word to the notary. After testifying that he wrote the will section by section, the notary was asked:

" After she made one disposition, what then would occur ? "

He answered : " Then I would make another, after Mr. Lancaster would speak to her."

" After she had a conversation with the other parties present, and after she got through that conversation ? "

" She dictated to me."

" In that dictation did anybody put in and assist her in the dictation ? "

" I think so ; I think Mr. Lancaster assisted her."

We think the entire testimony on this subject shows that no one suggested any new ideas to Mrs. Tomatis ; and that the assistance which she received consisted in the suggestion to her by her counsel of words suitable to express her will and intention. We know no good reason why she should not have been so assisted, as Ricard says, at the time of the making of the will. She might have had a model or form prepared for her by the notary or by her counsel, after she had informed them perfectly of her intended dispositions ; and from such model or form she might validly have dictated her will. But she could not read, and must have depended solely on her memory for the words, not familiar to her, necessary to accomplish her purposes. If these words might have been written by her counsel before the work of dictating and writing commenced, there is no reason why they should not be suggested for each separate clause, immediately after the completing of the preceding clause.

The will must be the work of the testator alone, so far as the disposition of his property is concerned ; and he must dictate, address to the notary, the words to be written by the notary as the will. It is no cause of nullity that the testator, not accustomed to use the technical language of testamentary dispositions, has availed himself of the advice and assistance of counsel in selecting the words and shaping the phraseology which he has immediately dictated to the notary as the expression of his will.

There is no cause to suspect that this will is not precisely that which the testatrix intended to make. It was not made *in extremis;* she was not in bad health; and she lived six months after it was made. She must have known that by that will she had given one house to Adolphe, another to Elizabeth, and another, and all her movables, even money, to Eugénie. If she had not been satisfied, if she had changed

her mind, there was ample time to have revoked this will, and to have made new dispositions in accordance with her wishes.

We are constrained to differ with our learned brother of the district court in his appreciation of the testimony; and to hold that the will in question was dictated by the testatrix, and that it is valid.

The judgment appealed from is therefore annulled, avoided, and reversed; and it is now ordered, adjudged, and decreed that the dèmand of plaintiffs be rejected, and their suit and petition be dismissed with costs in both courts.

Rehearing refused.