127 So.2d 61 (1961)
SUCCESSION of Perry HERSON and Carrie Davis Herson.
No. 5163.
Court of Appeal of Louisiana, First Circuit.
January 30, 1961.
Rehearing Denied March 6, 1961.
*62 L. C. Parker, Joel B. Dickinson, Baton Rouge, for appellant.
N. Cleburn Dalton, Elmo Lear, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, JONES and LANDRY, JJ.
LANDRY, Judge.
The paramount issue involved in these consolidated appeals, (the instant case having been united with that of No. 5164 on the docket of this court entitled Ford et al. v. Herson, 127 So.2d 73, both for purposes of trial and appeal), is the alleged invalidity of a nuncupative will by public act executed by decedent Carrie Davis Herson on September 12, 1955, and offered for probate in the present numbered and entitled cause. The attack on the testament herein involved is founded primarily on three basic contentions, namely: (1) confection of the will was obtained by fraud, duress, intimidation and trickery; (2) lack of testamentary capacity on the part of decedent; and (3) failure of the notary who received the will to observe certain formalities prescribed by Article 1578, LSA-C.C. which sets forth the requirements and procedure which must be followed in the execution of a testament of such nature. Alternatively, opponents maintain that the bequest to the legatee James Herson infringes upon their legitime and pray that in the event the will is held valid and ordered to probate, said bequest be reduced to decedent's one-third disposable portion.
In addition to the foregoing issues, there is presented for determination the matter *63 of the fee of the attorney who initiated the succession proceedings as well as the fees of appraisers who valued the property shown on the inventory taken herein and also the fees of certain medical experts who gave testimony concerning the testamentary capacity of decedent at the time of execution of the will in question.
On December 24, 1957, decedent Carrie Davis Herson departed this life at her domicile in the City of Baton Rouge, Louisiana. Following her demise two of her children, namely, Alice Herson Ford and Florence Herson Simmons, alleging themselves to be children of decedent Carrie Davis Herson, instituted proceedings to jointly open the succession of said decedent Carrie Davis Herson and her predeceased husband, father of petitioners, Perry Herson, who died during 1936. Alleging that both of said decedents died intestate and that petitioners together with four other children of decedents, namely, Stella Herson Burke, Ella Herson Morris, Hattie Herson Alexander and Bessie Herson Shine, and three grandchildren, issue of a predeceased son, Harrison Herson, namely, James D. Herson (defendant in suit No. 5164), Mary Herson Clark and Carrie Herson Baptiste, are the sole surviving heirs at law of said decedents. Alleging the necessity of an administration of these estates, petitioners requested that an inventory of said decedents' properties be made and petitioners appointed co-administratrixes of said decedents' estates. An order for the taking of the requested inventory being granted, an inventory was made on January 30, 1956, indicating said decedents left gross estates valued at the sum of $21,999.48.
Before letters of administration could be issued to petitioners Alice Herson Ford and Florence Herson Simmons, one James D. Herson, grandchild of decedents, intervened in the succession proceedings by filing an answer in opposition to the application for letters of administration and produced for probate in the succession proceedings a nuncupative will by public act executed before Jack P. F. Gremillion, Notary Public, under date of September 12, 1955. The petition of opposition tendered by James D. Herson prayed that said last will and testament be ordered registered, executed and admitted to probate and that he be confirmed as testamentary executor of the estate of decedent Carrie Davis Herson as provided for in decedent's will. He further prayed that the inventory taken January 30, 1958, be annulled and set aside insofar as the estate of decedent Carrie Davis Herson is concerned and a new inventory of said decedent's estate be taken and that the order authorizing publication of the application of Alice Herson Ford and Florence Herson Simmons for letters of administration of the estate of decedent be recalled and said applicants ordered to show cause to the contrary on a date to be fixed by the court.
Following the opposition entered by James D. Herson, five of decedent's children, namely, Alice Herson Ford, Florence Herson Simmons, Hattie Herson Alexander, Ella Herson Morris and Bessie Herson Shine, instituted a separate action against their nephew, James D. Herson, attacking the will and asserting the invalidity thereof on the grounds hereinabove set forth. By agreement the succession proceedings and the direct action to annul decedent's will were then consolidated in the court below for purposes of trial resulting in judgment declaring decedent's will to be valid and ordering same probated, which judgment has been appealed by all of decedent's children except Stella Herson Burke.
The issues of alleged undue influence exerted upon decedent by her grandson as well as decedent's lack of testamentary capacity will be better understood in the light of decedent's background and environment. At the time of her death on December 24, 1957, decedent, a Negro woman, was approximately 84 years of age. She had been in ill and failing health for a number of years. Although admittedly infirm and somewhat feeble she was not bedridden but *64 was ambulatory without crutches albeit she needed constant care and attention because of her advanced years. Possessed of a strong constitution and a spirit of determination she was firmly disposed to be as independent as her condition would permit. There is considerable dispute in the record concerning the condition of her hearing and sight, some of the testimony indicating she was practically deaf and blind whereas other equally credible witnesses testified she could see and hear reasonably well considering her age. Decedent lived in her own home with her daughter Florence who taught school. During the day decedent was cared for by persons brought to the home to remain with her or left in the care of neighbors or acquaintances until Florence returned. Alice Herson Ford, another daughter, visited her mother daily and she and Florence shared the burden of attending to decedent's person and financial and business affairs. For approximately 20 years decedent had been under the care of Dr. Butler who treated her frequently for heart disease, hardening of the arteries and high blood pressure. Approximately three years preceding her demise she began consulting Dr. Blunk who treated her for these same disorders. A fair analysis of the testimony reveals that as so often occurs in persons her age she was subject (because of her arteriosclerosis) to periods in which she sustained lapses of memory impairing her ability to understand and making it difficult to retain her attention to a particular subject matter. During these episodes it is clear that she was not in possession of her full mental faculties although no witness contended she was insane. That she was able to get about is attested by the fact that approximately three weeks prior to making her will she returned by train from a trip to Chicago to which city she was taken by her children for the purpose of consulting medical authorities with the view of possibly improving her hearing. While enroute home on this occasion her only remaining son, Joseph P. Herson, died and her children fearful that news of their brother's death would upset their mother made arrangements for a physician to meet her train and be present upon her arrival. Following Joseph's death her condition began to deteriorate and became progressively worse but for all practical purposes she continued ambulatory even making the trip to the office of the notary who received her will as well as that office of another attorney who settled the estate of her deceased son, Joseph, (her presence there being necssitated by the fact her son died without issue as a consequence of which she inherited a ¼ interest in his estate).
It is not disputed that decedent reared her grandson James in her home from the time of the death of decedent's son, Harrison Herson (father of James) who died in 1930 until 1940 at which time James left her home and established residence elsewhere. There is, however, considerable dispute on the issue of the frequency of James' visits to decedent subsequent to 1940 as well as the closeness of their relationship thereafter and the extent and degree of devotion, attention and assistance tendered her by James after his leaving her home. It is the contention of opponents that James rarely visited his grandmother and offered her no assistance whatsoever whereas James contends he visited her frequently and whenever she had need thereof placed at her disposal a taxicab which he owned and operated.
It is hornbook law that one seeking to nullify a testament for alleged undue influence, duress, coercion and trickery bears the burden of proving such charges by a preponderance of evidence.
After careful consideration of the evidence on the question of alleged fraud, duress, coercion, intimidation and trickery, we are of the opinion the opponents of the will have failed to prove said charges. The evidence on this issue is to say the least fragmentary, inconclusive and unconvincing. In this regard it suffices to say an attempt was made to show decedent was afraid of her grandson, James, because of *65 an altercation between James and his uncle, Joseph P. Herson (decedent's son) which fight occurred approximately one week prior to Joseph's death on August 22, 1955, it being insinuated by opponents that certain injuries allegedly inflicted by James upon his uncle in the fracas contributed to the death of the latter. By inference the opponents sought to create the impression that decedent did not intend or desire to make a will but that her grandson, James, tricked her into going to the office of the Notary for that purpose. On this score the evidence shows that on the date of making the will, Florence Herson Simmons (who resided with decedent) brought decedent to the home of a nearby acquaintance, Mary Rucker, and left decedent there in Mary's care while Florence attended to some personal business affairs. Florence testified that she lived with her mother and attended to all her business transactions and that at no time, either on the date the will was made or otherwise, did her mother ever mention making or desiring or intending to make a will. In this regard, her testimony is corroborated by that of other opponents of the will who likewise stated decedent never expressed an interest in making a will because she never mentioned it to them. The conclusion the court is asked to draw therefrom is that James made all arrangements for the execution of the will, waited until his aunts were away and then cajoled and tricked his grandmother into going to the attorney's office to make a will naming himself beneficiary of her estate. James, of course, denied any such conduct on his part stating that approximately two weeks prior to making the will, his grandmother told him that she wanted to leave him the property she had inherited from her recently deceased son, Joseph, as she wanted this property to stay in the name of Herson. His testimony shows that being so informed by his grandmother he consulted Mr. Gremillion who in effect advised him to bring decedent to his office when she was ready to make her will. James also testified that the night before the date of the will, his Aunt Alice telephoned and requested him to pick up decedent the next day at the home of Mary Rucker and bring her to town to attend to some business affairs. Acting upon this request, the next day he went to the home of Mary Rucker in a truck, picked up decedent and Mary and transported them to Mr. Gremillion's office in the Parish Courthouse where the will was drawn. He denied having threatened, coerced or intimidated his grandmother in any way whatsoever. Also on this issue is the testimony of a daughter, Stella Burke, who stated that to her knowledge decedent was afraid of no one and that on two occasions following the date of the will decedent related to her that decedent had made a will leaving certain property to James. Moreover, Mary Rucker, who accompanied decedent and her grandson to and from the attorney's office (and who also was a witness to the will) testified that at no time did it appear that decedent was afraid and nothing in the conduct of decedent indicated a reluctance on her part to execute a will or an unwillingness to leave in a truck with her grandson.
The record in this case convinces us that testatrix willingly, voluntarily and freely executed the will in question. There is not one scintilla of evidence in the voluminous record in this case (consisting of some 650 pages of transcribed testimony) corroborative of the charge of undue influence lodged herein against the beneficiary under decedent's will. We conclude, as did the learned trial court, that the allegations of coercion, undue influence and trickery are without merit. Additionally, the undue influence, such as intimidation or fraud necessary to vitiate a testament must have been exercised upon the testator at the moment the will was executed. Succession of Franz, 232 La. 310, 94 So.2d 270, Texada v. Spence, 166 La. 1020, 118 So. 120, 62 A.L.R. 281. The record in this case is totally devoid of evidence indicative of undue influence upon testatrix at the time her will was drawn. *66 Such reprehensible conduct will not be presumed by courts of law. The evidence in the case at bar, at most, gives rise only to a vague inference of such an occurrence and is not of such character as to support a conclusion of nullity predicated thereon.
As defined by the laws and jurisprudence of this state testamentary capacity means possession of one's mental faculties to the extent the testator has full knowledge and understanding of the import and effect of his action. He must be legally sane or experience a lucid interval continuing throughout the period required to confect the testament. In the instant case there is no contention of insanity on the part of decedent, on the contrary, all parties concede her sanity.
Testamentary capacity is always presumed and the burden is upon the party attacking the will to prove that at the time of making the will the testator was not of sufficiently sound mind to fully understand the nature of the testamentary act and appreciate its effects. Artigue v. Artigue, 210 La. 208, 26 So.2d 699. In determining whether testamentary capacity was present the test is whether such capacity existed at the moment of making the will. Cormier v. Myers, 223 La. 259, 65 So.2d 345. The degree of proof required to overcome the presumption of testamentary capacity is similar to that required in criminal cases to overcome the presumption of innocence. Succession of Lambert, 185 La. 416, 169 So. 453.
Testamentary capacity is a question of fact and more specifically the presence of such requisite condition at the precise time of making the will, the issue being one which must be decided in the light of the attending circumstances in each individual case. In reaching a conclusion on such issue courts will consider the physical and mental condition of testator not only at the time of making the will but also prior and subsequent thereto since the actions, conduct and physical and mental condition of testator before and after, as well as at the time of making the will, are of probative value in determining testamentary capacity.
The issue, being one primarily of fact to be determined in accordance with the foregoing rules, necessarily requires consideration in some detail of the testimony of the various witnesses regarding the physical and mental condition of decedent at the time her will was made.
Dr. Leo S. Butler, testifying on behalf of opponents stated he had been decedent's physician for approximately 25 years prior to her death. She was for a number of years afflicted with high blood pressure, heart disease and hardening of the arteries. In his opinion decedent was possessed of fair vision for a person her age but she was somewhat hard of hearing although his testimony shows he was never required to shout or yell in order to make her understand whatever he told her. Dr. Butler stated that her mind occasionally wandered because of her arteriosclerosis but generally she was mentally alert and conscious of what went on about her. Subsequent to the death of her son, Joseph, in August, 1955, decedent grew slowly and progressively worse. In his opinion decedent had frequent periods during which she was perfectly lucid and in control of her mental faculties. He was also of the opinion it was possible she was absolutely lucid at the time she made her will although he was not present on that occasion and could not express an opinion thereon one way or the other.
In substance, Reverend Dudley T. Smith, an acquaintance, testified he had known decedent approximately 25 years and in decedent's declining years he had visited her about once a month. He observed that decedent's mind would "wander" at times. He too, noticed a decline following the death of decedent's son, Joe, but he was also of the opinion decedent was not insane and that her hearing and eyesight were *67 poor. He was also of the opinion decedent had lucid intervals.
H. J. Miller, a plumbing and heating contractor, who occasionally performed work on certain houses belonging to decedent, stated that he saw decedent frequently and after Joseph's death noted that decedent had become extremely unreliable. In his opinion decedent was disoriented and childish at times and he felt that she was incapable of making a decision.
A former employee of decedent's son Joseph, Willie Turner, testified he knew decedent for about 14 years prior to her death. In effect he testified decedent at times knew him and at other times did not.
Mary Rucker, an acquaintance in whose home decedent visited, stated decedent's sight, hearing and memory were poor. At times decedent did not recognize her although the witness frequently cared for decedent. She was one of the witnesses to the will and testified that upon arriving at the attorney's office the day the will was made decedent inquired of her "Where am I?" and "What am I doing here?" In the opinion of this witness decedent did not possess sufficient mental capacity to understand what she was doing at the time the will was executed.
Another acquaintance, Alice Guinn, gave testimony to the effect she had known decedent for 50 years and considered decedent's mental condition as "not good". Decedent did not recognize her at all times and she noted that subsequent to Joseph's death decedent continued to speak of him as though he were still alive. She was present on the day when James picked up decedent at the home of Mary Rucker to take her to the attorney's office and felt that decedent understood what James told her and additionally that James did not have to raise his voice to make her understand.
Oliver J. Bergeron, an industrial insurance collector, stated he called at decedent's home weekly to collect insurance premiums on a policy held by Florence Simmons. He spoke with decedent on practically each visit. Following the death of Joseph, decedent frequently stated she wanted him to meet her son. He detected a marked change in her condition following Joseph's demise. Although she was somewhat absent minded, she recognized him each time he came and always called him "Mr. National", the word "National" being a part of the name of his employer.
Emma Thompson, a former employee of the now deceased Joseph Herson, testified she saw decedent approximately twice weekly on which occasions decedent came to the cab stand operated by Joseph. Subsequent to Joseph's death the witness denoted quite a change in decedent's condition. She observed decedent's inability to focus attention on a single topic and a tendency to ramble in her speech. This witness stated she frequently took decedent for rides and had numerous occasions to observe decedent's conduct. She did not consider decedent insane and conceded that at times decedent appeared rational and normal.
Dr. C. E. Blunck, Jr. testified in substance that he first began treating decedent in about 1954. Despite her rather poor physical condition (which he diagnosed the same as did Dr. Butler), he considered her rational and lucid at times. She was feeble but generally ambulatory and sustained occasional temporary loss of memory. Decedent's condition deteriorated following Joseph's death and he saw her frequently thereafter as she did not tolerate the event very well. She was perfectly capable of having lucid intervals and he occasionally saw her in such condition although in his opinion for the most part she was not lucid. He was of the opinion that she could have very well been perfectly lucid and rational on September 12, 1955 although he readily admitted she could just as well have been irrational at the time. He would not, however, express an opinion as to whether she was or was *68 not rational on said date as he did not see her at that time.
Dr. Marion Koepfler, a dermatologist, testified in effect that he first saw decedent in October, 1950, at which time he treated her for a skin cancer. The treatment consisted of radiology applied for eight successive days. He again saw her and administered similar treatment for a like condition in 1955, on which occasion he noted her general condition had grown worse. He described her condition as "senile psychosis" resulting in poor memory and a decreased ability to comprehend. Upon the last visit to him she appeared rational. Dr. Koepfler declined to express an opinion concerning her mental condition as he felt unqualified to do so.
Alice Herson Ford and Florence Herson Simmons (daughters of decedent) testified their mother was extremely hard of hearing and in order to make her understand it was necessary to hold her hand, attract her attention by looking her squarely in the face and then speaking in a very loud voice and repeating whatever it was they wanted to tell her. They both stated their mother's eyesight was very poor and her general health such that she was never left alone. According to them the trip which decedent made to Chicago in 1955 was for the purpose of seeking an improvement in her hearing. On this occasion their mother was accompanied by two members of the family. For a number of years prior to her death these parties had assumed full care of decedent, Florence living in the home with decedent, and Alice visiting her daily. Alice Ford stated her mother was seldom rational or lucid and that she was not in possession of her mental faculties on the date the will was made. Florence Simmons testified without equivocation that decedent was totally incompetent to make a will; that she was unable to understand anything at all and whenever a decision concerning her affairs was needed the children met, discussed the matter, arrived at the decision they deemed in decedent's best interest and then took whatever action proved necessary. Despite their opinion decedent lacked testamentary capacity on September 12, 1955, they conceded that subsequent thereto, namely, in November and December, 1955, decedent had been induced and permitted to join in the proceedings filed in connection with settlement of the estate of her son, Joseph Herson, in addition to transferring and leasing certain assets decedent therein acquired. They explained this inconsistency by stating that they considered her incapable in each instance but that as to the transactions entered into by her subsequent to the will, her children met, discussed the proposals, decided upon a course of action, explained the effects thereof to decedent as best they could and proceeded according to what they believed to be her best interest.
The testimony of James Herson is substantially that he was close to decedent and visited her frequently as she had reared him. He made his taxicab available to her whenever the need therefor arose. She was normal, carried on an ordinary conversation without difficulty and it was no effort to understand her or make her understand. Her hearing and sight were not the best but it enabled her to get around without guidance or direction. On the date he called for her in his truck she was perfectly rational, lucid and normal.
The Notary who received decedent's will, Jack P. F. Gremillion (presently Attorney General of Louisiana), was, at the time, Assistant to the Honorable J. St. Clair Favrot, District Attorney, Nineteenth Judicial District, comprised of the parish of East Baton Rouge. Mr. Gremillion testified he did not see testatrix prior to the date of September 12, 1955, on which occasion she came to the District Attorney's office in the Parish Courthouse, accompanied by her grandson, James Herson, and a Negro woman. James Herson had contacted him prior to this date informing him that testatrix wished to make her will at which time Gremillion instructed Herson to bring testatrix to his office when she decided to confect the will. The previous *69 night James or someone else called him and made an appointment for the next day. When testatrix arrived at his office, Mr. Gremillion ascertained her wishes and then proceeded to draft the will in accordance therewith. He experienced no difficulty whatsoever in conversing with decedent and was not required to raise his voice to make himself heard or understood. Nothing in her conduct, demeanor or reactions indicated that she was unable to understand and fully grasp the significance of the occasion. He considered that she appeared normal and lucid and stated that had he noted evidence to the contrary he would have declined to proceed.
The remaining witnesses to the will, Mrs. Dorothy Ward and Mrs. Ruth Dampf (employees of District Attorney Favrot) both testified in substance that decedent appeared normal in every respect. They did not recall her having any difficulty in hearing and understanding everything said and done at the time. Both were of the positive opinion testatrix was able to fully understand the events which transpired and appreciate the effects thereof.
J. S. Powell, a realtor, who had business relations with decedent on several occasions testified that his last contact with her was in late 1955 or early 1956, at which time he considered decedent to be normal for her age. He also testified that in conversing with decedent it was not necessary for him to raise his voice to be heard and understood.
Stella Herson Burke (a daughter of decedent who declined to participate in the contest of decedent's will) testified she did not live with her mother but in recent years had lived in Mississippi and Tennessee where she taught school. She visited her mother occasionally and spent a considerable portion of her summer vacation each year with her mother to relieve her sisters, Florence and Alice, of some of the burden of caring for decedent. This witness testified unequivocally her mother was not insane and was perfectly normal as to hearing, sight and ability to understand. She further testified that in late 1955 and again in 1957, decedent told her she, decedent, had given some of her property to her grandson, James, whom she and the other members of the family affectionately referred to as "Buddy".
From the foregoing analysis of the mass of evidence introduced herein, we conclude the record shows that although testatrix was infirm and partially senile due to her advanced years and ravages of time, she was entirely capable of possessing testamentary capacity and did, in fact, have possession and control of her faculties on the date of execution of the will herein under attack. The testimony of Doctors Butler and Blunck, as well as that of every other witness herein, clearly supports the conclusion she was not insane. That her mind was subject to wandering at times is hardly open to question. On the other hand, it is equally certain that at times she was normal, rational and lucid. The only witness who questioned her lucidity at the time the will was being drawn was Mary Rucker who is flatly contradicted by Mr. Gremillion and the two remaining witnesses to the will, all three of whom are without interest quoad the outcome of this litigation. Their testimony clearly shows that during the entire time the will was being drawn testatrix gave every outward indication of rationality and comprehension of the nature, scope and effect of the transaction involved.
As did the learned trial judge, we conclude the opponents of the will have failed to discharge the burden incumbent upon them of establishing that decedent Carrie Davis Herson lacked testamentary capacity at the time of drawing the will in contest herein.
We shall next consider the contention decedent's will is invalid because of a failure to comply with the requirements of Article 1578 LSA-C.C. which reads in full as follows:

*70 "The nuncupative testaments by public act must be received by a notary public, in presence of three witnesses residing in the place where the will is executed, or of five witnesses not residing in the place.
"This testament must be dictated by the testator, and written by the notary as it is dictated.
"It must then be read to the testator in presence of the witnesses.
"Express mention is made of the whole, observing that all those formalities must be fulfilled at one time, without interruption, and without turning aside to other acts."
In this regard, the position of opponents is two-fold: First, that testatrix did not dictate the will to the Notary in the presence of the witnesses whose names are thereunto subscribed as such and, secondly, the occurrence of an alleged interruption of such nature as to vitiate the testament.
Mr. Gremillion's testimony shows that when decedent was brought into his office he took her into another room where she told him what dispositions she wished to make. After ascertaining her intentions he then prepared a will pursuant to Act 66 of 1952, LSA-R.S. 9:2442 et seq., which permits a testament to be executed before a Notary Public and two witnesses. After preparing this testament he discussed its validity with District Attorney Favrot in which discussion it was pointed out by Mr. Favrot that the form prescribed by Act 66 of 1952 could not be used in decedent's case as decedent could neither read nor write. (The preparation of the statutory will and the discussion held concerning its validity are corroborated by the testimony of Mr. Favrot.) Upon being so advised Mr. Gremillion then consulted the Civil Code and upon reading the provisions of Article 1578 thereof proceeded, with the open code before him, to prepare a will in accordance therewith, it being his testimony that he meticulously followed each and every requirement therein. Before commencing with the will he called testatrix into a private office and summoned Mrs. Ward, Mrs. Dampf and Mary Rucker after first inquiring of Mrs. Ward whether she was a resident of the Parish since he recalled that at one time Mrs. Ward resided outside East Baton Rouge Parish. He purposely excluded James Herson from the room as he knew James was to be a beneficiary under the will. After these preliminaries, testatrix, seated across a desk from him and around which the witnesses were arranged, related to him in the presence of the witnesses exactly what she wished to do and he personally typed the will setting forth therein the substance of her expressed desires. He does not contend he copied her words verbatim but he did testify without equivocation that the testament accurately reflects the true import of her stated wishes. He estimated the entire matter consumed some one and a half or possibly two hours during which no one entered or left the room except that at one point his superior, District Attorney Favrot, opened the door as if to enter the room whereupon Gremillion waved him away and in obedience to said signal, he immediately closed the door and withdrew. After the will was thus completed he then read it to testatrix in the presence of Mrs. Ward, Mrs. Dampf and Mary Rucker, inquired if it was what testatrix wanted and upon testatrix replying in the affirmative proceeded to have testatrix and the witnesses sign in the presence of each other and affixed his own signature thereto.
Mary Rucker testified that upon entering the courthouse, she, testatrix and James Herson went upstairs into a rather large office divided by a railing or counter. She and testatrix were seated outside the railing while James went to another part of the room and conferred with some people. She recalled some typing going on in another section of the room and later someone came over to testatrix and guided her to a desk or table where she signed the will. She was virtually certain the will was not written *71 in the presence of the witnesses and that when testatrix was first addressed it was solely for the purpose of getting her to go over to the desk and sign the will. She did not recall but one will being made and also stated that all during the procedure James Herson remained in the room. The impression the court gains from her testimony is that the entire matter transpired in an anteroom or public waiting room rather than a private office which we believe most unlikely. She further stated that after testatrix signed, she (Mary Rucker) signed her name three or four times after being told she was witnessing a will and receiving assurance from the Notary that she would not get into any trouble by affixing her signature to the document as a witness.
The testimony of Mrs. Ward is substantially that she did not recall but one will being made on that occasion and that when she was called to sign as witness the document was already prepared.
The remaining witness, Mrs. Dampf, also did not recall the first will and stated very frankly that her recollection of the whole affair was somewhat hazy. A fair analysis of her testimony is that she did not recall whether the will was or was not dictated in her presence although she did state she felt whatever version Mrs. Ward gave she, Mrs. Dampf, would accept as accurate.
James Herson testified that his grandmother, the Notary and witnesses went into a private office and he remained in the anteroom until they emerged after completing the will. He was seated in a position in which he could see the entrance to the room in which the will was being drawn and that no one entered or left the room during the entire procedure.
We believe the evidence supports the findings of the trial court that the will was, in fact, dictated by decedent to the notary in the presence of the subscribing witnesses and by said notary written down as dictated in the presence of said witnesses. The fact that the Notary did not write down her dictation verbatim is of no moment. It suffices if the notary in writing down the dictation of testator achieves an identity of thoughts, wishes and desires rather than a perfect duplication of words. Rostrup v. Succession of Spicer, 183 La. 1087, 165 So. 307. A nuncupative will by public act is not null because testator avails himself of the advice and assistance of the notary in choosing the words and terminology by which the wishes of testator are expressed. Landry v. Tomatis, 32 La.Ann. 113.
The solemn declaration in a nuncupative will by public act that the testament was dictated by the testator to the Notary in the presence of the subscribing witnesses and by him written down as dictated in the presence of said witnesses will not be disregarded unless the contrary be established by a preponderance of evidence. We believe as did the learned trial court the opponents have failed to establish by a preponderance of evidence that the testament herein involved was not dictated by decedent in the presence of the witnesses thereto.
Admittedly two of the witnesses (Ward and Rucker) testified the will was written out of their presence and while we do not question their veracity we point out these same two witnesses were positive that only one will was drawn whereas we think the record reflects without question that two testaments were, in fact, written. We also believe these two witnesses were confused by the first will which was no doubt written out of their presence and discarded when it was discovered testatrix could neither read nor write. The testimony of Mrs. Dampf in our opinion proves nothing except that she really did not recall one way or the other. Her statement that she would accept Mrs. Ward's views is of no weight in that it is purely conjectural in view of her own testimony that she simply did not remember.
Opposed to the foregoing testimony is that of the Notary who gave a clear and *72 concise narration of the events which transpired on the occasion in question. It clearly shows (as related in the will) that each and every required formality was scrupulously observed. In this he is corroborated to some extent by the testimony of James Herson who stated that no one entered or left the room during the time the notary, testatrix and witnesses were in the act of preparing decedent's testament. Some further slight corroboration thereof appears in the testimony of Mr. Favrot who stated that when he opened the door to attempt to speak to Gremillion, he noted that the notary, testatrix and witnesses were all there but he, of course, could not testify that all remained throughout the entire procedure.
The act of District Attorney Favrot in opening the door to the room and immediately retiring in compliance to a hand signal to withdraw does not constitute an interruption or turning aside sufficient to nullify the testament in question. In reality such an occurrence does not constitute an interruption at all. The character of interruption contemplated by the applicable codal article envisages interruption such that the business of confecting the testament is put aside and abandoned or confused with other matters unrelated thereto. Succession of Schlumbrecht, 138 La. 173, 70 So. 76.
A stipulation appears of record wherein it is agreed the fees of two realtors who testified as expert witnesses concerning the value of properties listed in the inventory taken herein, shall be fixed by the Court. Under the circumstances shown we are disposed to award each said expert witness a fee of $100.
With respect to the fees to be set for the medical experts who testified herein, we note that Doctors Butler and Koepfler reside in Baton Rouge whereas Dr. Blunck lives in Plaquemine, Louisiana. In view of said circumstances we assess the fees to be paid the former in the sum of $100 each and that to be paid the latter the amount of $125. The fees of the appraisers as well as said medical experts being chargeable as law charges to the estate of decedent Carrie Davis Herson considering said witnesses were called primarily to testify concerning matters pertaining to her estate.
The reasonableness of the fee of $1,000 awarded L. C. Parker, Attorney-at-Law, for services rendered in instituting these proceedings and representing opponents in the unsuccessful attack on decedent's will, is also before us. It will be recalled this matter involves two separate and distinct estates, namely that of decedents Perry Herson and Carrie Davis Herson. As of the present time the major portion of counsel's time, energy and efforts have been concerned with the attack on the will of Carrie Davis Herson, the trial thereof lasting five days. We believe an award of $1,200 will adequately compensate learned counsel for the work performed to date but that, as some of his time was necessarily concerned with handling matters relative to the estate of decedent Perry Herson, the fee awarded should be apportioned and charged one-third to the estate of decedent Perry Herson and two-thirds to that of testatrix Carrie Davis Herson, and the judgment of the trial court will be amended accordingly.
The evidence indicates a difference between the value of these decedents' estates as fixed by the appraisers who testified during the trial below and the value thereof as fixed by the appraisers who assisted in taking the inventory filed herein, said difference relating primarily to valuations placed on certain immovable property owned by testatrix.
It appears that a new inventory is requested primarily for the purpose of determining whether the bequest to the legatee, James Herson, exceeds the one-third disposable portion of testatrix, Carrie Davis Herson. Conceding the valuations placed upon certain immovable property belonging *73 to testatrix by the appraisers who testified herein, differs from those shown in the inventory of record, we see no reason to order a new inventory for the only certain effect thereof will be an unnecessary increase in the cost of administering these estates. A second inventory would be no more binding upon either the legatee or the forced heirs of testatrix than the first inventory; neither would such second inventory be decisive of the purported infringement upon the legitime of the forced heirs of testatrix. Were we to order a new inventory either the legatee or forced heirs or both would be free to attack any portion thereof deemed inimical to their respective interests, each being at liberty to introduce evidence contrary thereto and indicative of what each considers to be the true value of decedent's estate. The issue of alleged infringement upon legitime is a matter to be adjudged by the court after hearing all the evidence and considering all relevant and material factors including, inter alia, not only the established gross value of the estate but also the debts and liabilities left by testatrix, it being elementary that the issue presented is one to be solved upon determination of the net estate of testatrix.
Decision on the alternative plea for reduction of the bequest to the legatee James D. Herson insofar as same may exceed testatrix's disposable portion must await eventual determination of the net value of said decedent's estate, which net value may be ascertained only upon completion of the administration thereof. We do not have before us evidence upon which a conclusion on this issue could be founded. It is a matter which first must be disposed of by the trial court upon consideration of all the evidence.
For the reasons herein assigned, it is ordered, adjudged and decreed that the judgment of the trial court declaring that the nuncupative last will and testament of decedent Carrie Davis Herson, dated September 12, 1955, valid, and ordering same admitted to probate and executed, be and the same is hereby affirmed. It is further ordered the judgment of the trial court fixing the fee of Attorney L. C. Parker, at the sum of $1,000 be and the same is hereby amended by increasing said fee to the sum of $1,200 chargeable one-third to the estate of decedent Perry Herson and two-thirds to the estate of testatrix Carrie Davis Herson. It is further ordered, adjudged and decreed the fees of the realtors who testified herein as experts be and the same is fixed at $100 each; that the fees of Drs. Butler and Koepfler and Blunck who testified as medical experts herein be assessed at the sum of $100 each for Drs. Butler and Koepfler and $125 for Dr. Blunck, all said expert witnesses' fees to be charged to the estate of decedent Carrie Davis Herson as law charges.
Amended and affirmed.
HERGET, J., recused.